UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GARY ORLOWSKI, individually, and
ESTATE OF ALEXANDER L. ORLOWSKI,
by Special Administrator Gary Orlowski,

      Plaintiffs,

     v.

MILWAUKEE COUNTY, a body corporate,
IRBY ALEXANDER, ANTHONY MANNS,
and RONALD K. MALONE,

      Defendants.

Case No. 13-CV-1318

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
ADDITIONAL PROPOSED FINDINGS OF FACT**

---

     Pursuant to Civil L.R. 56(b) of the United States District Court for the Eastern District of Wisconsin, defendants, Milwaukee County, Irby Alexander, Anthony Manns, and Ronald Malone, respectfully submit the following responses to plaintiffs' additional proposed findings of fact.

    1.    In 2007, it was Defendant, Milwaukee County's (the County), policy that the only contemporaneous record containing HOC correctional officer observations about inmates was the log book. (Simatic Decl., Ex. G at 23:18-25).

    **RESPONSE: Disputed. Plaintiffs mischaracterize the evidence of record. Captain Crissey testified that "observations out of the ordinary" would be recorded in log books. (Simatic Decl., Ex. G at 23:21.) In addition, Captain Crissey testified that HOC correctional officers may also record observations in their personal daybooks. (*Id.* at 23:22–24:1.) Moreover, written reports prepared by officers (such as the report prepared by Alexander regarding the events at issue) contained observations about inmates. (Simatic Decl., Ex. C.)**

2. In 2007, it was the County's policy that, if an HOC correctional officer did not write down an observation about an inmate in the log book, the observation did not happen. (*Id.* at 26:19 – 27:1).

**RESPONSE: Not disputed that the County's corporate designee testified that this was true "from a supervisor's perspective." (Simatic Decl., Ex. G at 26:24-25.) However, defendants dispute that this fact allows for a reasonable inference (as plaintiffs' contend) that any event not recorded in a log book literally did not occur.**

3. There is no mention of Alex Orlowski ("ORLOWSKI") snoring in the Zebra-2 dorm log book for November 22, 2007. (Rugaber Decl., Ex. G at pp.2-3.)

**RESPONSE: Disputed. Plaintiffs mischaracterize the evidence of record. While the word "snoring" does not appear in the Zebra-2 dorm log book for November 22, 2007, the description in the log book of Orlowski's sleeping pattern that morning is consistent with snoring and with Alexander's sworn testimony that Orlowski was snoring on the morning of November 22, 2007. (*Compare* Declaration of David Rugaber ("Rugaber Decl."), Ex. G at 2-3 *with* Simatic Decl., Ex. B at 209:15.)**

4. After ORLOWSKI's death at the HOC on November 22, 2007, Defendant, Irby Alexander ("ALEXANDER"), prepared a "To The Superintendent" report regarding the incident. (Simatic Decl., Ex. C; Id., Ex. B at 230:18 – 231:3.)

**RESPONSE: Not disputed.**

5. ALEXANDER testified at his deposition in this action that his "To The Superintendent" report accurately depicted the events of November 22, 2007 and his interactions with ORLOWSKI. (Simatic Decl., Ex. B at 232:3-6.)

**RESPONSE: Not disputed.**

6. There is no mention of ORLOWSKI snoring in ALEXANDER's "To The Superintendent" report. (*Id.*).

**RESPONSE: Disputed. Plaintiffs mischaracterize the evidence of record. While the word "snoring" does not appear in Alexander's "To the Superintendent" report for November 22, 2007, the description in the report of Orlowski's sleeping pattern that**

morning is consistent with snoring and with Alexander's sworn testimony that Orlowski was snoring on the morning of November 22, 2007. (*Compare* Simatic Decl., Ex. C *with* Simatic Decl., Ex. B at 209:15.)

7.      The first time ALEXANDER claimed that ORLOWSKI was snoring prior to his death on November 22, 2007 was at ALEXANDER's deposition in this action on July 14, 2015, when ALEXANDER was describing his belief that ORLOWSKI had a severe sleeping disorder. (Simatic Decl., Ex. B at 209:12-15).

**RESPONSE: Disputed. Plaintiffs mischaracterize the evidence of record. While the word "snoring" does not appear in the Zebra-2 dorm log book for November 22, 2007, or in Alexander's "To the Superintendent" report for November 22, 2007, the description in the log book and the report of Orlowski's sleeping pattern that morning is consistent with snoring and with Alexander's sworn testimony that Orlowski was snoring on the morning of November 22, 2007. (*Compare* Rugaber Decl., Ex. G at 2-3 and Simatic Decl., Ex. C *with* Simatic Decl., Ex. B at 209:15.)**

8.      The first time MANNS stated that ORLOWSKI was snoring prior to his death on November 22, 2007 was in his "To the Superintendent" report, dated November 23, 2007, when MANNS claims that ALEXANDER told him that Zebra-2 dorm inmates were complaining that ORLOWSKI was snoring too loud. (Safran Aff. at ¶ 8, Ex. F at p.1).

**RESPONSE: Not disputed.**

9.      According to ALEXANDER, Zebra-2 dorm inmates were not complaining that ORLOWSKI was snoring on November 22, 2007. (Simatic Decl., Ex. B at 214:20-21, 215:9-15).

**RESPONSE: Not disputed. However, any inconsistency between the sworn testimonies of Alexander and Manns on this issue is not material to the resolution of defendants' motion for summary judgment in defendants' favor.**

10.      "Apnea" is defined as "[a] temporary pause of breathing during sleep that can be very brief or can last so long that the amount of oxygen in the blood drops dangerously low." (Safran Aff. at ¶ 9, Ex. G at p.2).

**RESPONSE: Not disputed.**

11. "Apnea" is also defined as the "transient cessation of respiration whether normal (as in hibernating animals) or abnormal (as that caused by certain drugs)." Safran Aff. at ¶ 10, Ex. H at p.1).

**RESPONSE: Not disputed.**

12. The Mayo Clinic considers "sleep apnea" to be "a serious medical condition." (Safran Aff. at ¶ 11, Ex. I at p.1).

**RESPONSE: Not disputed.**

13. ALEXANDER testified at his deposition that he was concerned with ORLOWSKI's breathing and that ORLOWSKI had "sleep apnea." (Simatic Decl., Ex. B at 245:19-25).

**RESPONSE: Not disputed.**

14. ALEXANDER testified at his deposition that both he and Manns were concerned with ORLOWSKI's health based upon what ALEXANDER observed and wrote down in the Zebra-2 dorm log book at 4:00 AM on November 22, 2007. (Simatic Decl., Ex. B at 216:6-11).

**RESPONSE: Agree that was Alexander's testimony. Alexander then clarified in his testimony that he was concerned about noise and the potential to disturb other inmates and not that Orlowski had a medical condition "other than snoring loudly." (Simatic Decl., Ex. B at 216:19–217:19.)**

15. MANNS testified at his deposition that he was notified by ALEXANDER about the information contained in the Zebra-2 log book entry for 4:00 AM on November 22, 2007, except for the part about ORLOWSKI having "a severe sleeping disorder" and "not breathing at times." (Simatic Decl., Ex. D at 181:5 – 182:25).

**RESPONSE: Not disputed.**

16. In response to being notified by ALEXANDER about ORLOWSKI's serious medical condition at 4:00 AM on November 22, 2007, MANNS told ALEXANDER the following: "If he [ORLOWSKI] don't wake up for breakfast, then wait. Talk to him when you feel comfortable enough to talk to him or whatever." (Simatic Decl., Ex. D at 178:21-24).

**RESPONSE: Not disputed.**

17. During his deposition, MANNS testified that, if ALEXANDER had told him that ORLOWSKI was not breathing, MANNS would have instructed ALEXANDER to call for a medical emergency. (Simatic Decl., Ex. D at 184:1-4).

**RESPONSE:** Agree that is Manns' testimony, although disagree with the inference that Orlowski had stopped breathing entirely in the early morning of November 22, 2007. As Alexander noted in the Zebra-2 dorm log book, Orlowski appeared "not to be breathing *at times*" and had "a lot of difficulties sleeping." (Rugaber Decl., Ex. G (emphasis added).)

18.    After ORLOWSKI would not wake up for his kitchen worker assignment, former Zebra-2 dorm inmate Larry L. Green ("GREEN") told ALEXANDER that "something was wrong" with ORLOWSKI. (Affidavit of Larry L. Green, dated December 19, 2015 ["Green Aff."], at ¶19).

**RESPONSE:** Agree that is Green's statement. Disputed that Green made such a statement to Alexander. (Simatic Decl., Ex. B at 214:2-24.)

19.    GREEN repeatedly told ALEXANDER that "something was wrong" with ORLOWSKI, until he was placed in "the hole" at the HOC because he would not stop talking. (Green Aff. at ¶ 20).

**RESPONSE:** Agree that is Green's statement. Disputed that Green made such a statement to Alexander. (Simatic Decl., Ex. B at 214:20-24.)

20.    During the early morning hours of November 22, 2007, former HOC Inmate Gary L. Pirtle ("PIRTLE") also told ALEXANDER that "something was wrong" with ORLOWSKI. (Safran Aff. at ¶ 12, Ex. J at p.1).

**RESPONSE:** Disputed. Plaintiffs have not provided admissible evidentiary support for this proposed finding of fact. Pirtle's unsworn statement to a Milwaukee County Sheriff's Office detective on November 22, 2007 is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment. Regardless, disputed that Pirtle made such a statement to Alexander. (Simatic Decl., Ex. B at 214:20-24.)

21.    At some point between 3:45 AM and 4:00 AM on November 22, 2007, ALEXANDER attempted to wake up ORLOWSKI, but could not wake him up. (Simatic Decl., Ex. C at p.1; *Id.*, Ex. B at 210:17-23; Safran Aff. at ¶ 12, Ex. J at p.1; Safran Aff. at ¶ 13, Ex. K at p. 1).

**RESPONSE:** Agree that Alexander attempted to wake Orlowski at some point between 3:45 a.m. and 4:00 p.m. In response, Orlowski stopped snoring and changed

position. (Simatic Decl., Ex. C; *id.*, Ex. B at 230:18 - 232:6.) **Alexander did not try to wake**

**Orlowski to go to work in the HOC kitchen, because there were more inmates who were**

**assigned or volunteered than were needed. (*Id.*, Ex. B at 228:9-16.) There is no evidence**

**that Alexander tried further to wake Orlowski and that Orlowski failed to wake or**

**otherwise respond. Insofar as plaintiffs cite to the unsworn statements of inmates to a**

**Milwaukee County Sheriff's Office detective, the statements are inadmissible hearsay**

**pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment.**

22. Despite being required to wake up and go to breakfast pursuant to the County's written policy at the HOC in 2007 (Rugaber Decl., Ex. B at p.3), ORLOWSKI did not wake up for breakfast on November 22, 2007. (Simatic Decl., Ex. B at 242:5-18).

**RESPONSE: Not disputed. Orlowski was among the inmates assigned to work in**

**the kitchen to help make breakfast on the morning of November 22, 2007, but Alexander**

**did not wake Orlowski to go to work in the kitchen because there were more inmates who**

**were assigned or volunteered than were needed. (Simatic Decl., Ex. B at 228:9-16.)**

23. ALEXANDER did not call for medical attention for ORLOWSKI until 6:12 AM on November 22, 2007. (Rugaber Decl., Ex. G at p.3).

**RESPONSE: Not disputed. After hearing several inmates call out "man down,"**

**Alexander immediately walked over to Orlowski's bunk, where the call came from, and**

**Alexander observed Orlowski to be lying stiff and still in his bed. (Simatic Decl., Ex. B at**

**252:14 & 258:14-17.) He then immediately called for an emergency medical response. (*See***

**Defendants' PFOF ¶ 95; undisputed by plaintiffs.)**

24. One of the Plaintiffs' experts in this action, Daniel DeBehnke, M.D., M.B.A., has opined that if appropriate medical care had been given to ORLOWSKI prior to 5:48 AM on November 22, 2007, the last time that ORLOWSKI was observed by ALEXANDER to be alive, it is more likely than not that ORLOWSKI would have lived, and would have had "a complete and uncomplicated recovery." (Safran Aff. at ¶ 14, Ex. L).

**RESPONSE: Not disputed.**

25.     The Defendants' expert in this action, Chad Zawitz, M.D., agrees with Dr. DeBehnke that if appropriate medical care had been given to ORLOWSKI prior to 5:48 AM on November 22, 2007, the last time that ORLOWSKI was observed by ALEXANDER to be alive, it is more likely than not that ORLOWSKI would have lived, and would have had "a complete and uncomplicated recovery." (Safran Aff. at ¶ 15, Ex. M).

**RESPONSE: Not disputed.**

26.     According to the deposition testimony of the County's corporate designee, it would have taken approximately 3-10 minutes for an ambulance from the City of Franklin Fire Department to respond to a call from the HOC. (Simatic Decl., Ex. G at 147:18-23).

**RESPONSE: Not disputed.**

27.     The County's corporate designee testified that, under the County policy at the HOC in 2007, if a correctional officer observed an HOC inmate who appeared not to be breathing, the correctional officer should either start CPR and/or contact the health services unit for medical attention. (Simatic Decl., Ex. G at 143:24 – 144:5).

**RESPONSE: Agree that was Captain Crissey's testimony in the context of discovering an inmate who was lying on the floor and not breathing. (Simatic Decl., Ex. G at 143:6 – 144:5.) Otherwise, defendants dispute this proposed findings as unsupported by the cited evidence.**

28.     The County's corporate designee testified that, if a correctional officer cannot wake up an inmate without knowing why the inmate will not wake up, it is a medical emergency. (Simatic Decl., Ex. G at 140:11-15).

**RESPONSE: Agree that Captain Crissey testified that such a circumstance may, in an officer's discretion, constitute a medical emergency and require the office to contact a supervisor. (Simatic Decl., Ex. G at 140:1 – 41:5.) Otherwise, defendants dispute this proposed findings as unsupported by the cited evidence. In addition, dispute that Alexander ever tried to wake Orlowski without getting him to physically respond. (*See* response to PFOF ¶ 21 above.)**

29.     The County's corporate designee testified that, if a correctional officer cannot wake up an inmate without knowing why the inmate will not wake up, the correctional officer should contact a supervisor. (Simatic Decl., Ex. G at 140:16-18).

**RESPONSE: Disputed. Captain Crissey testified that if a correctional officer cannot wake up an inmate without knowing why the inmate will not wake up, "he *may* contact his supervisor." (Simatic Decl., Ex. G at 140:16-18 (emphasis added).)**

30.     The County's corporate designee testified that, after a supervisor has been notified by a correctional officer about an inmate who cannot be woken up, the supervisor should contact the HOC health center for medical attention. (Simatic Decl., Ex. G at 140:24 – 141:5).

**RESPONSE: Disputed. Captain Crissey testified that the supervisor, after evaluating the situation and "see[ing] if there's credibility to what the officer is saying," then the supervisor would contact the HOC health center "if that's needed." (Simatic Decl., Ex. G at 140:24 – 141:5.)**

31.     In 2007, the County had a written policy for the administration of medication to HOC inmates. (Rugaber Decl., Ex. D).

**RESPONSE: Not disputed.**

32.     Pursuant to the County's written policy at the HOC in 2007, during the administration of medication to inmates: "Inmate opens mouth after swallowing oral medication to allow a visual inspection of the mouth by the LHC [Licensed Health Care] staff and Security Staff <u>to ensure inmate has swallowed the medication</u>." (Rugaber Decl., Ex. D at p.2, ¶ 4) (emphasis added).

**RESPONSE: Not disputed.**

33.     Samuel M. Fitzpatrick ("FITZPATRICK") arrived at the HOC Zebra-2 dorm on approximately November 15, 2007. (Delgado Aff. at ¶ 6).

**RESPONSE: Not disputed.**

34.     From November 15 until 22, 2007, HOC employees administered seven methadone pills to FITZPATRICK, two times per day. (Safran Aff. ¶ 20, Ex. R at p.2).

**RESPONSE: Not disputed.**

35.     Samuel R. Pelkey ("PELKEY") was an HOC Zebra-2 dorm inmate from approximately July 2007 until November 22, 2007. (Affidavit of Samuel R. Pelkey, dated January 18, 2016 ["Pelkey Aff."], at ¶ 1).

**RESPONSE: Not disputed.**

36.     Dominic A. Lebourgeois ("LEBOURGEOIS") was an HOC Zebra-2 dorm inmate in 2007. (Safran Aff. at ¶ 16, Ex. N at p.1).

**RESPONSE: Disputed. Plaintiffs have not provided admissible evidentiary support for this proposed finding of fact. Lebourgeois' unsworn statement to a Milwaukee County Sheriff's Office detective is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment.**

37.     When the HOC nurses gave FITZPATRICK the Methadone pills, they failed to adequately check FITZPATRICK's mouth to ensure that he was not "cheeking" the pills. (Pelkey Aff. at ¶ 9; Safran Aff. at ¶ 16, Ex. N at p.1).

**RESPONSE: Agree that this is Pelkey's statement. Dispute that it occurred. Both officers and nurses routinely conducted such mouth inspections when administering medications. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Supplemental Declaration of Kurt M. Simatic ("Simatic Suppl. Decl."), Ex. A at 37:18-20; *id.*, Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.) Moreover, the cited statement from Lebourgeois does not provide support for this proposed finding of fact, and his unsworn statement to a Milwaukee County Sheriff's Office detective is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment. Regardless, any violations of the policies and procedures of the HOC by its employees do not establish deliberate indifference or other constitutional violations on their part. *See*, *e.g.*, *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531-32 (7th Cir. 2000) (holding that violations of state law do not equate to constitutional violations); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) (citing *Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988)) (holding that violations of department policy do not equate to constitutional violations).**

38.     As a result of the HOC employees failing to adequately check FITZPATRICK's mouth, he did not swallow the methadone pills, but he instead was able to "cheek" the pills. (Pelkey Aff. at ¶ 8).

**RESPONSE: Agree that is Pelkey's statement. Dispute that it occurred. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.) Regardless, any violations of the policies and procedures of the HOC by its employees do not establish deliberate indifference or other constitutional violations on their part. *See, e.g., Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531-32 (7th Cir. 2000) (holding that violations of state law do not equate to constitutional violations); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) (citing *Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988)) (holding that violations of department policy do not equate to constitutional violations).**

39. Henry T. Delgado ("DELGADO") was an HOC Zebra-2 dorm inmate from approximately July 2007 until November 22, 2007. (Affidavit of Henry T. Delgado, dated December 4, 2015 ["Delgado Aff."], at ¶ 1)

**RESPONSE: Not disputed.**

40. At times when HOC nurses administered methadone pills to FITZPATRICK, DELGADO was standing right behind FITZPATRICK and observed him take the pills out of his mouth and put them in his hand. (Delgado Aff. at ¶ 10).

**RESPONSE: Agree that is Delgado's statement. Dispute that it occurred. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.) Regardless, any violations of the policies and procedures of the HOC by its employees do not establish deliberate indifference or other constitutional violations on their part. *See, e.g., Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531-32 (7th Cir. 2000) (holding that violations of state law do not equate to constitutional violations); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) (citing *Ford v. Childers*,**

**855 F.2d 1271 (7th Cir. 1988)) (holding that violations of department policy do not equate to constitutional violations).**

41.     Jan A. Bergstrom is a retired Milwaukee County nurse.  (Safran Aff. ¶ 17, Ex. O at 13:22 – 15:2).

**RESPONSE: Not disputed.**

42.     To prevent FITZPATRICK from "cheeking" methadone during medication administration, the methadone could have been administered in liquid form, because it is impossible to "cheek" medication in liquid form.  (Safran Aff. ¶ 17, Ex. O at 29:15 – 30:7).

**RESPONSE: Not disputed.  However, "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."  *Smith v. Sangamon Cty. Sheriff's Dep't.*, 715 F.3d 188, 191 (7th Cir. 2013).**

43.     Pamela Bottani is a nurse who worked at the HOC in 2007.  (Safran Aff. ¶ 18, Ex. P at 10:8-11).

**RESPONSE: Not disputed.**

44.     To prevent FITZPATRICK from "cheeking" methadone during medication administration, HOC employees could have ordered the safety measure that FITZPATRICK remain visible in sight for 30 minutes after the administration of methadone pills, to ensure that the pills dissolved in his mouth.  (Safran Aff. ¶ 18, Ex. P at 18:4-23).

**RESPONSE: Admit that is Bottani's testimony.  However, "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."  *Smith v. Sangamon Cty. Sheriff's Dep't.*, 715 F.3d 188, 191 (7th Cir. 2013).**

45.     According to the Criminal Complaint against FITZPATRICK prepared by the Milwaukee County District Attorney's Office, FITZPATRICK sold methadone pills to ORLOWSKI from at least November 18 until 21, 2007.  (Safran Aff. ¶ 20, Ex. R at p.2).

**RESPONSE: Not disputed.**

46.     PELKEY stated that FITZPATRICK sold methadone pills to ORLOWSKI from at least November 19 until November 21, 2007.  (Pelkey Aff. at ¶¶ 12-14).

**RESPONSE: Not disputed.**

47.    GREEN stated that he observed FITZPATRICK sell methadone pills to ORLOWSKI. (Green Aff. at ¶ 6).

**RESPONSE:** Not disputed.

48.    FITZPATRICK told DELGADO that he was selling methadone pills to ORLOWSKI. (Delgado Aff. at ¶ 12).

**RESPONSE: Disputed.  Fitzpatrick's statement to Delgado is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment.**

49.    HOC correctional officers should have known that FITZPATRICK was selling methadone pills to ORLOWSKI, because the sales took place near the bunks of the Zebra-2 dormitory.  (Green Aff. at ¶ 7).

**RESPONSE: Disputed.  Plaintiffs have not provided admissible evidentiary support for this proposed finding of fact, as Green's statement on this issue constitutes impermissible argument and speculation.  In addition, what officers *should* have observed is immaterial for the purposes of plaintiffs' Eighth Amendment claims, as negligence is insufficient to sustain a deliberate indifference claim. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[p]roof of deliberate indifference requires more than [a] showing of simple or even heightened negligence").**

50.    At approximately 7:25 AM on November 22, 2007, only about one hour after ORLOWSKI died, HOC Nurse Kristen Babe ("BABE") told HOC Corrections Manager Virginia Ertman ("ERTMAN") that she knew that FITZPATRICK "has a history of selling his meds." (Safran Aff. ¶ 19, Ex. Q at pp.2-3).

**RESPONSE: Not disputed.**

51.    BABE would not have been the only HOC employee who was aware of FITZPATRICK's history of selling his medications.  (Simatic Decl., Ex. H at 104:25 – 105:5).

**RESPONSE: Disputed.  Babe also testified that she had no idea whether other correctional officers or supervisors at the HOC were aware of Fitzpatrick having a history of selling his medications.  (Simatic Decl., Ex. H at 100:11-19.)**

52.    BABE would have told other HOC employees about FITZPATRICK's history of selling his medications.  (Simatic Decl., Ex. H at 104:25 – 105:5).

**RESPONSE: Disputed.** Babe also testified that she had no idea whether other correctional officers or supervisors at the HOC were aware of Fitzpatrick having a history of selling his medications. (Simatic Decl., Ex. H at 100:11-19.)

53. During his deposition in this action, Dr. Zawitz testified that "diversion" of medication is where an inmate who receives medication hides it instead of taking it, and then provides it to another inmate. (Safran Aff. ¶ 15, Ex. M at 46:13-25).

**RESPONSE: Not disputed.**

54. During his deposition in this action, Dr. Zawitz agreed with his deposition testimony in a previous action, that it would have been standard practice for a correctional facility such as the HOC to house an inmate who was receiving methadone in a medical unit instead of the general population, to prevent the diversion (sales) of methadone to other inmates. (Safran Aff. ¶ 15, Ex. M at 71:2 – 72:6).

**RESPONSE: Agree that is Dr. Zawitz's testimony.** However, "the existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Smith v. Sangamon Cty. Sheriff's Dep't.*, 715 F.3d 188, 191 (7th Cir. 2013).

55. In 2007, the HOC Zebra-2 dorm was a general population dorm. (Simatic Decl., Ex. G at 125:19-22).

**RESPONSE: Not disputed.**

56. GREEN observed ORLOWSKI take six methadone pills on November 17, 2007. (Green Aff. at ¶ 8).

**RESPONSE: Agree that is Green's statement.**

57. When ORLOWSKI took methadone, he seemed like he was "high." (Green Aff. at ¶ 11).

**RESPONSE: Agree that is Green's statement.**

58. ORLOWSKI was impaired by methadone on November 20 and 21, 2007. (Pelkey Aff. at ¶¶ 15, 19).

**RESPONSE: Agree that is Pelkey's statement.**

59. Paul D. Burgess ("BURGESS") was an HOC Zebra-2 dorm inmate from approximately July 2007 until July 2008. (Safran Aff. ¶ 21, Ex. S at p.1).

**RESPONSE: Not disputed.**

60.     During the week before he died, ORLOWSKI looked like he was "'high' intoxicated by drugs." (Safran Aff. ¶ 21, Ex. S at p.1).

**RESPONSE: Disputed. Plaintiffs have not provided admissible evidentiary support for this proposed finding of fact. Burgess' unsworn statement to a Milwaukee County Sheriff's Office detective is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment.**

61.     Tony J. Thompson ("THOMPSON") was an HOC Zebra-2 dorm inmate in November 2007. (Safran Aff. ¶ 22, Ex. T at p.1).

**RESPONSE: Not disputed.**

62.     An HOC sergeant observed ORLOWSKI to be intoxicated by drugs on November 21, 2007. (Safran Aff. ¶ 22, Ex. T at p.1).

**RESPONSE: Disputed. Plaintiffs have not provided admissible evidentiary support for this proposed finding of fact. Thompson's unsworn statement to a Milwaukee County Sheriff's Office detective is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment. Further, plaintiffs mischaracterize Thompson's statement, as all Thompson says in his statement is that he observed Orlowski speaking with an HOC sergeant on November 21, 2007.**

63.     On November 20, 2007, ORLOWSKI's ears were bleeding, so much so that he was seen at the HOC infirmary. (Pelkey Aff. at ¶¶ 16-17).

**RESPONSE: Agree that is Pelkey's statement. Dispute that it occurred. HOC records do not indicate that Orlowski was seen in the infirmary for any reason on November 20, 2012. (Supplemental Declaration of David Rugaber, Ex. B.) Moreover, Virginia Ertmann's "To The Superintendent" Report recorded after Orlowski's death states that there was only one sick call slip in Orlowski's file from June 2005. (*Id.*, Ex. A.)**

64.     When ORLOWKSI was taking Methadone, which began at least by November 17, 2007, his ears were bleeding and his eyes were red and bloodshot. (Green Aff. at ¶¶ 8, 12).

**RESPONSE:  Agree that is Green's statement.**

65.     For two or three days prior to ORLOWSKI's death, he was scratching himself all over his body and scratching his ears to the point that they were bleeding.  (Delgado Aff. at ¶ 13).

**RESPONSE:  Agree that is Delgado's statement.**

66.     During the week before he died, ORLOWSKI's nose was red and his eyes were dilated.  (Safran Aff. ¶ 22, Ex. T at p.1).

**RESPONSE:  Disputed.   Plaintiffs have not provided admissible evidentiary support for this proposed finding of fact.  Thompson's unsworn statement to a Milwaukee County Sheriff's Office detective is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802 that cannot be considered on summary judgment.**

67.     One of the stages of methadone overdose is a "high."  (Safran Aff. ¶ 14, Ex. L at p.3).

**RESPONSE:  Not disputed.**

68.     The County's written policy at the HOC in 2007 was that:  "Substance abuse in the close confines of a secure facility can lead to serious discipline and safety problems." (Rugaber Decl., Ex. F at p.1).

**RESPONSE:  Not disputed.**

69.     Part of the safety issues associated with substance abuse in a secure facility is the possibility of inmate overdose.  (Simatic Decl., Ex. G at 151:13 – 152:3).

**RESPONSE:  Not disputed.**

70.     The County's written policy at the HOC in 2007 was "to fairly and comprehensively monitor substance abuse by residents."  (Rugaber Decl., Ex. F at p.1).

**RESPONSE:  Not disputed.**

71.     Despite the fact that fairly and comprehensively monitoring substance abuse by residents was the County's policy at the HOC in 2007, the County cannot say what that policy means, except that it "possibly" includes monitoring inmates for drug impairment and for the physical signs of drug impairment.  (Simatic Decl., Ex. G at 153:1 – 156:14).

**RESPONSE: Disputed. It is undisputed that the County maintained numerous policies, including policies regarding contraband, the provision of health care, medication distribution, and drug testing, that addressed the prevention of substance abuse by inmates at the HOC. (*See* Defendants' PFOF ¶¶ 16-31; Rugaber Decl., Exs. A-F.) Moreover, plaintiffs' mischaracterize the cited testimony, as the witness testified only that she did not have knowledge about how the policy was implemented at the HOC in 2007. (Simatic Decl., Ex. G at 154:3-6.)**

72.     The County cannot say whether it used good or bad policies with respect to document retention at the HOC in 2007. (Simatic Decl., Ex. G at 33:20-23.)

**RESPONSE: Disputed. Plaintiffs' mischaracterize the cited testimony, as the witness testified only that she did not have knowledge about whether the County used good or bad policies or practices with respect to storing documents at the HOC in 2007. (Simatic Decl., Ex. G at 33:20:23.)**

73.     The only thing the County's designee could say about the retention of the log books was that they were stored in a closet. (Simatic Decl., Ex. G at 32:7-11.)

**RESPONSE: Disputed. Plaintiffs' mischaracterize the cited testimony, as the witness testified that the County's policy has been to keep completed log books permanently and that in 2007 completed log books at the HOC were stored in a closet that she did not have access to, and plaintiffs' counsel asked no follow up questions. (Simatic Decl., Ex. G at 30:19-32:11.)**

74.     Pursuant to the County's written policy in 2007: "Destruction of records shall not proceed if an audit or pending litigation involves the records scheduled for destruction." (Safran Aff. ¶ 23, Ex. U at p.10).

**RESPONSE: Not disputed.**

75.     The County's corporate designee testified that "pending litigation" includes both a lawsuit that has been filed and the possibility of a lawsuit being filed. (Simatic Decl., Ex. G at 47:21 – 48:6.)

**RESPONSE: Not disputed.**

76. On March 3, 2008, the County was served with a Wisconsin Statute Section 893.80(1)(a) Notice of Circumstances of Claim, which set forth Plaintiff, Gary Orlowski's ("GARY") claims against the County arising out of the death of ORLOWSKI at the HOC on November 22, 2008. (Safran Aff. ¶ 24, Ex. V).

**RESPONSE: Not disputed, with the clarification that Orlowski died on November 22, 2007.**

77. ALEXANDER had not received any medical training while a correctional officer at the HOC. (Simatic Decl., Ex. B at 75:16-18).

**RESPONSE: Disputed. Plaintiffs' mischaracterize the cited testimony, as the testimony can only be read to indicate that Alexander has never received training or education as a health care professional. Indeed, it is undisputed that, as of November 22, 2007, Alexander was certified as a corrections officer by the State of Wisconsin Department of Justice Law Enforcement Standards Board pursuant to training and qualification standards established by the State. (Defendants' PFOF ¶ 6; Rugaber Decl. ¶¶ 2-3; Simatic Decl., Ex. A at 67:10-12.) Instructional goals for this certification include "assist[ing] with heath care program." Wis. Admin. Code § LES 3.04(1)(a)10.**

78. ALEXANDER was not sufficiently trained to respond to an emergency situation. (Simatic Decl., Ex. B at 269:11 – 270:14).

**RESPONSE: Disputed. Plaintiffs' mischaracterize the cited testimony. Alexander testified only that he believed he was not sufficiently trained to respond to a specific security breach alarm at the HOC in February 2004, not the events of November 22, 2007. (Simatic Decl., Ex. B at 269:11-270:14.)**

79. The County did not provide HOC nurses and correctional officers with specific training with respect to conducting the mouth inspection of inmates during medication administration. (Simatic Decl., Ex. D at 76:8 – 77:2).

**RESPONSE: Disputed. The cited testimony does not provide support for this proposed finding of fact. Moreover, Alexander specifically testified that he was taught to**

thoroughly check an inmate's mouth to ensure he had swallowed his medication and that he did such mouth inspections every time he helped administer medications. (Simatic Decl., Ex. B at 125:9-21.)

80. The NIC Report found the following at the HOC: "Crucial training records and training materials were not available." (ECF No. 1-1 at p.53, ¶ K(1)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

81. The HOC did not have a document containing a summary of training by year and job classification available for the NIC consultant. (ECF No. 1-1 at p.53, ¶ K(2)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

82. The NIC Report determined that the HOC failed to provide substantive training on "first responders," and failed to have "specific protocols for responding to a call for assistance or alarm." (ECF No. 1-1 at p.55, ¶ K(8)).

**RESPONSE: Not disputed. However, as there is no dispute that Alexander immediately radioed that he had a medical emergency in the Zebra-2 dorm when he observed Orlowski to be lying stiff and still in his bed after inmates called out "man down," (Defendants' PFOF ¶¶ 91, 94-95; undisputed by plaintiffs), this finding is irrelevant to resolution of the defendants' summary judgment motion in defendants' favor. Furthermore, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.) In addition, it is undisputed that, as of November 22, 2007, Alexander and Manns were both certified as corrections officers by the State of Wisconsin Department of Justice Law**

Enforcement Standards Board pursuant to training and qualification standards established by the State. (Rugaber Decl. ¶¶ 2-3.)

83. None of the NIC findings set forth in the Plaintiffs' Statement of Additional Facts ("SAF") ¶¶ 80-82 were disputed by the HOC in the NIC Report Analysis prepared by HOC Acting Superintendent Jeffrey L. Mayer. (Safran Aff. ¶ 4, Ex. B).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

84. The NIC Report stated that the area of management and supervision is "an area that is in need of profound change if HOC is to become an effective, high functioning organization." (ECF No. 1-1 at p.33, ¶ F(1)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

85. The NIC Report found that: "To a large extent at HOC, supervisors don't supervise and managers don't manage." (ECF No. 1-1 at p.34, ¶ F(3)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

86. The NIC Report determined that: "There is no stability with regard to the assignment of correctional officers to specific dormitories or other posts." (ECF No. 1-1 at p.34, ¶ F(3)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

87. The NIC Report found that: "The Sergeant also has an unrealistically large span of control." (ECF No. 1-1 at p.34, ¶ F(3)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

88.     The NIC Report concluded that:  "None of these factors makes it easy for the Sergeant to be an effective supervisor."  (ECF No. 1-1 at p.34, ¶ F(3)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

89.     None of the NIC findings set forth in SAF ¶¶ 84-88 were disputed by the HOC in the NIC Report Analysis prepared by HOC Acting Superintendent Jeffrey L. Mayer.  (Safran Aff. ¶ 4, Ex. B).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

90.     The NIC Report contains 139 pages of detailed criticisms of the HOC in 2007. (ECF Nos. 1-1 and 1-2).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

91.     The NIC Report concluded that "the overall picture at HOC is one of many long-standing and deep-seated problems."  (ECF No. 1-1 at p.23, ¶ 6).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)**

92.     The NIC conclusion set forth in SAF ¶ 91 was not disputed by the HOC in the NIC Report Analysis prepared by HOC Acting Superintendent Jeffrey L. Mayer.  (Safran Aff. ¶ 4, Ex. B).

**RESPONSE**: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.)

93.     The County's corporate designee could not say that HOC corrections officers always conducted mouth inspections of inmate receiving medications, despite the requirement that they do so under the County's written policy at the HOC in 2007. (Simatic Decl., Ex. G at 90:11-23).

**RESPONSE**: Disputed. Plaintiffs mischaracterize the cited testimony. The witness testified only that, although it was policy that officers always conduct mouth inspections of inmates receiving medications, she could not swear under oath that every single officer conducted a mouth inspection every single time an inmate received medications in 2007. (Simatic Decl., Ex. G at 90:15:23.) Moreover, it is undisputed that both officers and nurses routinely conducted such mouth inspections when administering medications. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21–48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.)

94.     When ERTMAN was an HOC corrections officer, she did not conduct mouth inspections to ensure that inmates swallowed their medications. (Simatic Decl., Ex. F at 51:7-10;

**RESPONSE**: Not disputed. However, Ertman was a corrections officer between 1994 and 1999. (Simatic Decl., Ex. F at 23:12-16.) In addition, Ertman testified that nurses, rather than corrections officers, conducted mouth inspections when medications were administered to inmates. (*Id.* at 52:11-18.)

95.     ERTMAN stated that HOC corrections officers were not always present to monitor inmates receiving medication. (Simatic Decl., Ex. F at 58:19 – 59:2).

**RESPONSE**: Not disputed. However, Ertman testified that nurses, rather than corrections officers, conducted mouth inspections when medications were administered to inmates. (Simatic Decl., Ex. F at 52:11-18.)

96.     Despite being a corrections manager, ERTMAN was not aware that there was a County written policy that required correctional officers to conduct mouth inspections to ensure that inmates swallowed their medications.  (Simatic Decl., Ex. F at 51:11-16; 57:17 – 58:5).

**RESPONSE:  Agree that is Ertmann's testimony.  However, Ertman testified that nurses, rather than corrections officers, conducted mouth inspections when medications were administered to inmates.  (Simatic Decl., Ex. F at 52:11-18.)**

97.     Former HOC nurse Amy Lynn Hazen stated that, at the HOC in 2007, at least 90% of the time corrections officers failed to conduct mouth inspections of inmates receiving medications.  (Safran Aff. ¶ 25, Ex. W at 7:2 – 8:6; 23:17 – 24:21).

**RESPONSE:  Not disputed that Hazen testified as much.  However, it is disputed that this was true.  Both officers and nurses routinely conducted such mouth inspections when administering medications.  (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.)**

98.     PELKEY stated that HOC nurses did not adequately check to make sure that inmates swallowed their medication, which allowed those inmates to "cheek" their medication. (Pelkey Aff. at ¶ 7).

**RESPONSE:  Not disputed that Pelkey stated as much.  However, it is disputed that this was true.  Both officers and nurses routinely conducted such mouth inspections when administering medications. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; *id.*, Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.)**

99.     GREEN stated that HOC nurses and correctional officers often did not check the inmates' mouths to make sure that they were swallowing and not "cheeking" their medications. (Green Aff. at ¶ 15).

**RESPONSE:  Not disputed that Green stated as much.  However, it is disputed that this was true.  Both officers and nurses routinely conducted such mouth inspections when administering medications.  (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and**

53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; *id.,* Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.)

100.   DELGADO stated that HOC inmates were able to hide medication in their cheeks and/or under their tongues because some HOC nurses and correctional officers did not always check properly to ensure that inmates swallowed their medications when administered.  (Delgado Aff. at ¶ 9).

**RESPONSE: Not disputed that Pelkey stated as much.  However, it is disputed that this was true.  Both officers and nurses routinely conducted such mouth inspections when administering medications.  (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; *id.*, Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.)**

101.   Prior to ORLOWSKI'S death at the HOC on November 22, 2007, ALEXANDER was aware that inmates shared medications with other inmates who were not supposed to have those medications.  (Simatic Decl., Ex. B at 115:17-22).

**RESPONSE: Disputed.     Plaintiffs  mischaracterize  Alexander's  testimony. Alexander testified only that there were "instances" of inmates sharing medications with other inmates that were not supposed to have them, although he did not know how often that occurred.  (Simatic Decl., Ex. B at 114:11 – 115:22.)  Both officers and nurses routinely conducted such mouth inspections when administering medications.  (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.)  Despite the best efforts by health care and corrections staff at the HOC to implement the HOC Med. Pass Policy, cheeking and palming by inmates was still possible and did occur from time to time.  (Simatic Decl., Ex. H at 48:7-11.)**

102.   BABE stated that HOC inmates hoarding and selling medications for canteen items was a "classic thing."  (Simatic Decl. at 96:22 – 97:6).

**RESPONSE: Agree that is Babe's testimony. However, it is disputed that her testimony means that this was a routine occurrence. Both officers and nurses routinely conducted such mouth inspections when administering medications. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.) Despite the best efforts by health care and corrections staff at the HOC to implement the HOC Med. Pass Policy, cheeking and palming by inmates was still possible and did occur from time to time. (Simatic Decl., Ex. H at 48:7-11.)**

103.    During its investigation into ORLOWSKI's death, Milwaukee County Sheriff's Office investigators found one-half of an orange pill wrapped in tissue under the mattress of former Zebra-2 dorm inmate Anthony Barnes. (Safran Aff. ¶ 26, Ex. X at p.3)

**RESPONSE: Not disputed.**

104.    DELGADO stated that, in 2007, "it was a regular practice for HOC inmates to sell and trade medications for canteen items. (Delgado Aff. at ¶ 28).

**RESPONSE: Agree that is Delgado's statement. However, it is disputed that this was true. Both officers and nurses routinely conducted mouth inspections when administering medications. (Simatic Decl., Ex. B at 125:3-21; *id.*, Ex. H at 47:21 – 48:2 and 53:6-10; Simatic Suppl. Decl., Ex. A at 37:18-20; Ex. B at 41:7-10; *id.*, Ex. C at 40:10–21; id., Ex. D at 60:25–61:9; Safran Aff., Ex. W at 26:7-13.) Despite the best efforts by health care and corrections staff at the HOC to implement the HOC Med. Pass Policy, cheeking and palming by inmates was still possible and did occur from time to time. (Simatic Decl., Ex. H at 48:7-11.)**

105.    DELGADO knew that some HOC correctional officers were aware that inmates were selling and trading medications, but the officers did not seem to care. (Delgado Aff. at ¶ 30).

**RESPONSE: Disputed. Plaintiffs do not provide a sufficient evidentiary basis for this proposed finding of fact, as Delgado's conclusory statement as to what "some HOC**

correctional officers" subjectively knew and thought about inmates selling and trading medications is inadmissible evidence on summary judgment as lacking foundation and being based on speculation. **Fed. R. Evid. 602 and 701.**

106. PELKEY admits that, when he was at the HOC in 2007, he would sometimes "cheek" Seroquel when it was administered to him by HOC employees, and then sell the Seroquel to other inmates. (Pelkey Aff. at ¶¶ 20-21).

**RESPONSE: Agree that is Pelkey's statement.**

107. PELKEY stated that, in 2007, former HOC inmate Pierce Warren also sold Seroquel, which was administered to him by HOC employees, to other inmates. (Pelkey Aff. at ¶ 23).

**RESPONSE: Agree that is Pelkey's statement.**

108. The NIC Report identified direct supervision as "one of the most serious and far reaching problems at the HOC." (ECF No. 1-1 at p.57, ¶ L(1)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.) Moreover, "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."** *Smith v. Sangamon Cty. Sheriff's Dep't.*, 715 F.3d 188, 191 (7th Cir. 2013).

109. The NIC Report stated: "Central to direct supervision is the premise that the officer assigned to a dorm gets to know the inmates on that dorm, and visa versa." (ECF No. 1-1 at p.59, ¶ L(7)).

**RESPONSE: Not disputed. However, the referenced report was published and first available to the HOC in January 2008, after the incarceration and death of Orlowski. (ECF No. 1-1 at 1.) Moreover, "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."** *Smith v. Sangamon Cty. Sheriff's Dep't.*, 715 F.3d 188, 191 (7th Cir. 2013).

110. At the time of his death, ORLOWSKI was 20 years old. (Affidavit of Gary Orlowski, dated January 11, 2016 ["Orlowski Aff."], at ¶ 3).

**RESPONSE: Not disputed.**

111.  Until the date of his death, ORLOWSKI was part of his original immediate family and was living with GARY.  (Orlowski Aff. at ¶ 4).

**RESPONSE: Not disputed.**

112.  Except for short periods of incarceration, and one month in approximately 2005 spent living in a duplex with a roommate pursuant to a Milwaukee County program offered by his probation officer, ORLOWSKI lived at home with GARY his entire life.  (Orlowski Aff. at ¶ 5).

**RESPONSE: Not disputed.**

113.  For the entire time ORLOWSKI lived with GARY; he had a curfew and had to come home every night, even after he was 18 years old.  (Orlowski Aff. at ¶ 6).

**RESPONSE: Not disputed.**

114.  While ORLOWSKI lived with GARY, he performed chores such as cutting the grass, shoveling snow, making dinner and washing dishes.  (Orlowski Aff. at ¶ 7).

**RESPONSE: Not disputed.**

115.  ORLOWSKI was single and had no children.  (Orlowski Aff. at ¶ 8).

**RESPONSE: Not disputed.**

116.  GARY took care of all of ORLOWSK's financial needs, such as providing him food, shelter, clothes and other necessary items.  (Orlowski Aff. at ¶ 9).

**RESPONSE: Not disputed.**

117.  ORLOWSKI had sporadic, short-term employment that did not provide for his financial needs.  (Orlowski Aff. at ¶ 10).

**RESPONSE: Not disputed.**

118.  GARY provided emotional support to ORLOWSKI, because he was not emotionally an adult.  (Orlowski Aff. at ¶ 11).

**RESPONSE: Not disputed.**

119.  ORLOWSKI and GARY enjoyed many activities together, such as boxing and fishing.  (Orlowski Aff. at ¶ 12).

**RESPONSE: Not disputed.**

120.    When ORLOWSKI got into boxing at age 15, GARY worked as a judge and timekeeper for boxing matches.  (Orlowski Aff. at ¶ 13).

**RESPONSE:  Not disputed.**

121.    When ORLOWSKI was at the HOC in 2007, GARY visited him at least once each week.  (Orlowski Aff. at ¶ 14).

**RESPONSE:  Not disputed.  However, during Gary Orlowski's visits to the HOC in 2007 to see Orlowski, he did not have any reason to suspect that Orlowski was taking drugs other than those being prescribed to him and the subject of drug use never came up between them.  (Simatic Decl., Ex. A at 45:15 – 46:25.)**

Dated this 8th day of February, 2016.

<div style="margin-left:40%;">

s/ Kurt M. Simatic
_____
Charles H. Bohl
Andrew A. Jones
Kurt M. Simatic
Attorneys for Defendants
WHYTE HIRSCHBOECK DUDEK S.C.
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email: cbohl@whdlaw.com
Email: ajones@whdlaw.com
Email: ksimatic@whdlaw.com

</div>