UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GARY ORLOWSKI, individually, and
ESTATE OF ALEXANDER L. ORLOWSKI,
by Special Administrator Gary Orlowski,

        Plaintiffs,

v.

MILWAUKEE COUNTY, a body corporate,
IRBY ALEXANDER, ANTHONY MANNS,
and RONALD K. MALONE,

        Defendants.

Case No. 13-CV-1318

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiffs' claims against the two remaining individual defendants fail right at the outset because plaintiffs cannot even come close to showing that either Irby Alexander or Anthony Manns violated a clearly established constitutional right of Alexander Orlowski under the qualified immunity analysis mandated by three recent decisions from the Supreme Court. Without question, it is no longer sufficient for a plaintiff to argue merely that an officer was deliberately indifferent to a prisoner's general rights to medical care or adequate conditions of confinement. Instead, a plaintiff must now address the specific circumstance facing the officer at a granular level and meet the burden of showing that *every reasonable officer* would have known *beyond debate* that a constitutional right was violated by the actions in question. The Supreme Court has taken the lower courts to task in no uncertain terms for misapplying its mandate and defining "clearly established" rights at too high a level of generality. Here, plaintiffs have failed altogether to demonstrate that either Alexander or Manns violated a clearly established right under the Eighth Amendment—either with respect to medical care or conditions of

confinement—in connection with the particular circumstances of Orlowski's death. Indeed, regardless of how Orlowski's Eighth Amendment rights to medical care or adequate conditions of confinement are defined, the record is clear that neither Alexander nor Manns violated those rights.

Plaintiffs' *Monell* claims against Milwaukee County are equally flawed. The essence of a *Monell* claim is that *municipal policymakers* have deliberately adopted a policy, custom, or practice that causes an agent of the municipality to violate the Constitution. Here, plaintiffs make claims of misconduct at the House of Corrections, but they do not ever attempt to link those claims to the conscious decisions of policymakers.

Defendants are entitled to summary judgment with respect to plaintiffs' Eighth Amendment claims in their entirety, as well as with respect to plaintiffs' claim for loss of a familial relationship. Conversely, plaintiffs' tardy motion for summary judgment should be denied.[1]

**I. EVEN IF PLAINTIFFS COULD ESTABLISH A CONSTITUTIONAL VIOLATION BY ALEXANDER AND MANNS—WHICH THEY CANNOT—THE CONSTITUTIONAL RIGHTS THEY CLAIM WERE VIOLATED WERE NOT CLEARLY ESTABLISHED.**

As detailed in defendants' initial brief, "[p]ublic officials are immune from suit under 42 U.S.C. § 1983 unless they have [(1)] 'violated a statutory or constitutional right [(2)] that was ***clearly established*** at the time of the challenged conduct.'" *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (emphasis added)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have

---

[1] In addition to being without merit, plaintiffs' motion for summary judgment violates the Court's scheduling order. (ECF No. 30.) There was a deadline for dispositive motions (December 18, 2015), and plaintiffs ignored it.

understood that he was violating it,'" *id*., meaning that "existing precedent must have placed the statutory or constitutional question **beyond debate**." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011) (emphasis added). As explained in defendants' initial brief, that very stringent standard was made abundantly clear in a trio of decisions from the Supreme Court in 2015.

First, in *City & County of San Francisco v. Sheehan*, the question was whether it was clearly established that "the officers violated the Fourth Amendment when they decided to reopen [plaintiff's] door rather than attempting to accommodate her disability." 135 S. Ct. at 1775. Then, in *Taylor v. Barkes*, the question was whether the "right to the proper implementation of adequate suicide prevention protocols" was clearly established. 135 S. Ct. 2042, 2044 (2015). And, in *Mullenix v. Luna*, the question was whether there was a clearly established rule that a "police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." 136 S. Ct. 305, 308-09 (2015). In all three cases, the Supreme Court answered the question "no" and made clear that such **general propositions** fell far short of being "clearly established" law.

Indeed, in *Sheehan*, the Court took the Ninth Circuit to task for misreading prior precedent regarding the meaning of "clearly established:

> [N]othing in our cases suggests the constitutional rule applied by the Ninth Circuit. The Ninth Circuit focused on *Graham v. Conner*, but *Graham* holds only that the "objective reasonableness" test applies to excessive-force claims under the Fourth Amendment. That is far too general a proposition to control this case. "We have repeatedly told courts–and the Ninth Circuit in particular–not to define clearly established law at a high level of generality." ***Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures***.

135 S. Ct. at 1775-76 (citations omitted, emphasis added). The Supreme Court reiterated that same sentiment in *Mullenix*. 136 S. Ct. at 311 (holding that it is error to define "the qualified immunity inquiry at a high level of generality" and then fail "to consider that question in 'the specific context of the case'").

The mandate from the Supreme Court is unequivocal: district courts must **not** define rights at a high level of generality and must instead closely examine the precise facts encountered by the defendant officers at a granular level of specificity in answering the question of whether the right in question is clearly established. In other words, the right must be so specifically defined that "***every reasonable official*** would have understood that what he is doing violates that right." *Taylor*, 135 S. Ct. at 2044 (emphasis added); *Mullenix*, 136 S. Ct. at 308.

Thus, the issue is not whether Orlowski's "right to be free from deliberate indifference to medical care" or his "right to adequate conditions of confinement" are clearly established, as defining the rights in such generalized terms is the antithesis of the Supreme Court's most recent directives. Rather, the proper question before this Court is whether an inmate has a clearly established right to immediate emergency medical attention for loud snoring and inconsistent breathing patterns during sleep. Or, put another way, the dispositive question is whether every reasonable jail official would have understood in November 2007 that the Constitution requires him to call for immediate emergency medical attention upon discovering an inmate who is snoring and breathing irregularly while sleeping rather than taking the reasonable steps to respond actually taken by Alexander and Manns.

Regardless of how the Court frames it, the right that plaintiffs must prove Alexander and Manns violated has to ***specifically*** relate to the circumstances of this case—*i.e.*, the specific symptoms that Orlowski exhibited and those officers' specific actions in response. When the issue is properly framed in this way, it is evident that there was no such ***clearly established*** right in place in November 2007 such that it is beyond debate that a reasonable officer in Alexander and Manns' shoes would have been aware that he was violating the Eighth Amendment if he did not call for immediate emergency medical attention in response to Orlowski's irregular breathing and snoring, rather than taking the other steps to respond taken by Alexander and

Manns. Put simply, there is and was no clearly established constitutional right on the part of an inmate to immediate emergency medical attention for loud snoring or inconsistent breathing during sleep.

In response to the argument that there was no clearly established right violated by Alexander and Manns, plaintiffs offer ***nothing***. Plaintiffs do not cite to ***a single controlling case*** to even suggest that the right that Alexander and Manns purportedly violated was clearly established at the time of the events in question. Instead, plaintiffs apparently argue, though not in express terms, that defendants mischaracterized the right at issue. In plaintiffs' view, the right at issue is not an inmate's right to immediate medical attention "for loud snoring or inconsistent breathing during sleep," but rather an inmate's right to immediate medical attention if observed to be "not breathing at times" during sleep and "having [an undiagnosed] severe sleeping disorder." (ECF No. 51 at 30.)

Plaintiffs' argument presents a distinction without a difference. Indeed, the right must be clearly established by binding precedent such it is ***"beyond debate"*** that ***"every reasonable official"*** would have understood that what he was doing violated that right. But, again, plaintiffs offer no such binding Supreme Court or Seventh Circuit precedent regarding a prisoner's right to immediate medical treatment (or a response beyond that of Alexander and Manns) under such circumstances—whether for snoring, irregular breathing during sleep, undiagnosed sleep apnea, or another undiagnosed sleep disorder. (And one district court decision from 2014 and another circuit court decision from outside the Seventh Circuit that are both factually distinguishable—along with two web pages from January 2016—do not constitute controlling precedent.) Thus, in the absence of clear, controlling precedent from before November 2007 establishing that Alexander and Manns were on notice that they were violating Orlowski's rights when they did

not call for immediate emergency medical attention in response to his irregular snoring and breathing, Alexander and Manns must be granted immunity.

The only other argument offered by plaintiffs on this issue is that somehow defendants did not argue for qualified immunity as to plaintiffs' "conditions of confinement claim" and are therefore barred from arguing it now. That argument makes no sense—either in the qualified immunity context or on the merits of the claim. Both of plaintiffs' underlying claims—for inadequate conditions of confinement and for failure to provide medical attention—are based on the deliberate indifference standard. (*See*, *e.g.*, ECF No. 1, ¶¶ 180, 181, & 188.) As such, defendants directly addressed the deliberate indifference standard in their moving brief. And, in doing so, they addressed both of plaintiff's underlying claims. (ECF No. 49 at 3-12.) Defendants are hard pressed to explain why plaintiffs, who pled deliberate indifference as the basis for both their conditions of confinement and failure to provide medical care claims, can argue that the moving brief does not address one or the other. The conditions of confinement claim has been directly addressed by defendants, and it, like the failure to provide medical care claim, fails for all of the reasons stated herein and in defendants' initial brief.

II. **PLAINTIFFS' CLAIMS AGAINST ALEXANDER AND MANNS FAIL BECAUSE NEITHER OFFICER HAD ANY INTERACTION WITH ORLOWSKI BEFORE THE MORNING OF HIS DEATH, THE MEDICAL CONDITION THE OFFICERS OBSERVED WAS NOT OBJECTIVELY SERIOUS, AND THEY TOOK REASONABLE STEPS TO RESPOND TO WHAT THEY KNEW.**

A. **Alexander and Manns Had No Knowledge Of Or Interactions With Orlowski Before the Morning of His Death.**

Even if some HOC nurses and corrections officers failed at times to check inmates' mouths during medication pass, and even if Orlowski was acting strangely or "high" in the days immediately before his death—neither of which defendants concede are actually true—such facts would not be pertinent to the resolution of plaintiffs' claims against Alexander and Manns. Indeed, the Court need not address whether there are issues of fact arising from disputes between

nurses' testimony and inmates' affidavits. Similarly, the Court need not address whether the Zebra-2 dorm log book or work schedules from November 2007 might have pointed to other staff who might have observed (or ignored) other inmates cheeking medications, Orlowski obtaining medications from his dorm mates, or Orlowski behaving in a manner suggesting he was high.[2] Indeed, what is dispositive for the purposes of plaintiffs' claims against Alexander and Manns (as they are the only remaining individual defendants) are the undisputed facts that neither was privy to any such information because they did not know anything about Orlowski and had never interacted with him at all prior to the morning of his death. (DPFOF ¶¶ 47, 71.) Absent proof that Alexander or Manns were aware of any such alleged circumstances regarding Orlowski—and, to be sure, plaintiffs point to absolutely no such evidence—they cannot be found to be deliberately indifferent to any inadequate conditions or confinement or need for medical care arising from those circumstances.

---

[2] Plaintiffs argue that defendants should be sanctioned because the Zebra-2 dorm log book for the week prior to November 22, 2007 and employee schedules from November 2007 are no longer available. Imposing sanctions for spoliation of evidence requires a showing that the destruction of evidence was done in bad faith, not just intentionally. *See*, *e.g.*, *Trask-Morton v. Motel 6 Operation L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001); *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). Bad faith generally means an effort to influence the outcome of litigation. *See*, *e.g.*, *Werner v. Pittway Corp.*, 90 F. Supp. 2d 1018, 1034 (W.D. Wis. 2000). In this case, plaintiffs make absolutely no allegation, let alone a showing, of bad faith on the part of defendants. Nor could they, as the Zebra-2 log book was confiscated by the Milwaukee County Sheriff's Office as part of its investigation into Orlowski's death and then not retained at the conclusion of the investigation, and the employee schedules were evidently destroyed as part of the routine destruction of records pursuant to the County's records retention policy. (Rugaber Supp. Decl. ¶¶ 5–6.) As such, there is no basis for the sanctions suggested by plaintiffs. Moreover, plaintiffs' effort to cry foul over the absence of these records is not persuasive given plaintiffs' failure to do anything with the information known to them from the portions of the log book that they possess. Indeed, if plaintiffs really intended to identify, depose, and sue other HOC staff for Orlowski's death, they undoubtedly would have started with the two officers clearly identified in the log book as having worked in the Z-2 dorm the evening of November 21, 2007. (Rugaber Decl., Ex. G.)

## B. Alexander and Manns Did Not Act With Deliberate Indifference To A Known Serious Medical Condition On The Morning Of Orlowski's Death.

Whether one characterizes Orlowski's condition as snoring or irregular breathing is of no consequence. Undeniably, Alexander and Manns were faced with an inmate who appeared to have a sleeping disorder. Plaintiffs' own medical expert, Dr. Daniel DeBehnke, confirmed that the symptoms Orlowski displayed were consistent with sleep apnea. (Safran Decl., Ex. L at 18.) Thus, to demonstrate the requisite deliberative indifference, plaintiffs must demonstrate that Orlowski's undiagnosed sleep apnea symptoms warranted immediate emergency medical attention and that the officers were aware of this fact.

Plaintiffs fail to adequately address both the objective and subjective elements necessary to prove that the officers were deliberately indifferent. They go to great lengths in attempting to demonstrate that sleep apnea is an objectively serious condition. However, the general medical research and dictionary definition offered by plaintiffs cannot overcome the undisputed facts that (1) Orlowski had not been diagnosed with sleep apnea, and (2) the symptoms displayed by Orlowski (snoring and irregularly breathing as he slept) were not ones that a layperson would recognize as needing immediate emergency medical treatment. Plaintiffs have certainly not cited any case law to that effect, and the closest Seventh Circuit decision identified by defendants also does not support plaintiffs on this point. *See Oliver v. Deen*, 77 F.3d 156, 159, 160–61 (7th Cir. 1996) (holding that a prisoner exhibiting symptoms such as "difficulty breathing," chest pains, wheezing, and "other common symptoms of an '[a]sthma [a]ttack'" did not constitute a serious medical condition).

Plaintiffs reference two cases discussing the long-term issues that can arise from the condition of sleep apnea, one from the Northern District of Illinois and the other from the Eighth Circuit. (ECF No. 51 at 6–7.) However, these cases do not stand for the proposition that corrections officers must wake up inmates who show signs or symptoms of sleep apnea and

immediately arrange for emergency medical treatment.  Indeed, these cases contain a critical distinction from the present matter: both inmates had been diagnosed with sleep apnea, and the dispute arose after officials withheld the use of a device prescribed to treat the condition.  *Dortch v. Davis*, No. 11-CV-0841-MJR-SCW, 2014 WL 1125588, at *2-3 (S.D. Ill. Mar. 21, 2014); *Meloy v. Schuetzle*, 230 F.3d 1363, 2000 WL 1160446, at *1-2 (8th Cir. 2000).

In contrast, here, the officers were faced with new symptoms of an undiagnosed sleep disorder in an inmate they did not know.  Moreover, because Alexander and Manns observed a snoring inmate who continued to sleep after an attempt to rouse him, the holding in *Laganiere v. County of Olmsted*, No. 12-CV-1205 (PJS/JSM), 2013 WL 6511850 (D. Minn. Dec. 12, 2013), *aff'd*, 772 F.3d 1114 (8th Cir. 2014), is on all fours with this case.  Simply put, under available case law, snoring and irregular breathing during sleep is not enough, by itself, to put jail personnel on notice that an inmate is suffering from a serious medical condition.

As defendants explained in their moving brief, an objectively serious medical condition requires:  (1) diagnosis by a physician; or (2) that the condition be so obvious that a lay person would recognize the need for a doctor to treat it.  *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).  No one disputes that Orlowski was not diagnosed with the condition.  Plaintiffs' claim rests on the ability to demonstrate that a lay person would recognize that sleep apnea requires immediate emergency medical attention, but they have provided absolutely no case law or other controlling authority for this proposition.

Plaintiffs' response also ignores the subjective component they must establish to show deliberate indifference.  Their argument is that the officers made notations in the log book that Orlowski appeared to have a sleeping disorder but did not call for emergency medical attention until after he was found unresponsive later that morning.  Plaintiffs summarily conclude that "[d]espite both ALEXANDER and MANNS knowing that ORLOWSKI had a serious medical

condition, they deliberately failed to provide ORLOWSKI with medical attention, resulting in his death." (ECF No. 51 at 16.) This argument ignores the central tenet of the subjective element—the officers' subjective knowledge of the alleged serious medical condition. Rather, plaintiffs seem to base their claims of deliberate indifference toward Alexander and Manns on the premise that they (or some other HOC staff) *should* have realized that Orlowski had overdosed or otherwise has a life-threatening sleep condition, which, of course, is insufficient to state a § 1983 claim. Officers must *actually* draw the inference that a substantial risk of serious harm exists. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[p]roof of deliberate indifference requires more than [a] showing of simple or even heightened negligence"); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (the officer must "draw the inference" that failing to provide the care creates a risk of harm). For their claim to survive, plaintiffs needed to demonstrate that Alexander and Manns knew that letting an inmate with undiagnosed sleep apnea continue to sleep created an unreasonable risk of harm. There simply is no evidence which can be construed to support this requirement.

In any event, both Alexander and Manns responded appropriately to the situation that they were aware of. It is undisputed that Alexander was unaware of Orlowski's history of substance abuse, any signs of his alleged drug use, or Orlowski's previously missed kitchen shifts because he had not interacted with him prior to that morning. (DPFOF ¶¶ 47, 71.) Alexander attempted to rouse Orlowski and observed him change position when he first observed his snoring and breathing pattern. (*Id.* ¶¶ 66–67.) If in fact other inmates told Alexander generally that "something was wrong" with Orlowski, this alone is insufficient to put Alexander on notice of a more significant problem than he had already observed. Regardless, Alexander did in fact respond to what little he knew by noting his observations in the dorm logbook, contacting his supervisor, and continuing to monitor Orlowski during his frequent

security checks.  (*Id.* ¶¶ 60, 70, 85, 88.)  Indeed, he last checked on Orlowski no more than 24 minutes before he was found unresponsive.  (*Id.* ¶¶ 88, 95.)  And, as to the claim that Alexander failed to get Orlowski up for his kitchen shift or breakfast, attendance at neither was required at the HOC in 2007 as long as it was authorized by HOC staff.  (*Id.* ¶ 33.)  Of course, there is no question that Orlowski showed signs of an objectively serious medical condition when the other inmates called out for Alexander at 6:10 a.m., but, at that point, Alexander appropriately responded to the situation and promptly called for an immediate emergency medical response.  (*Id.* ¶ 95.)  For his part, Manns—who also was not aware of Orlowski's history inside or outside of the HOC prior to November 22, 2007—understood Alexander's description of Orlowski's breathing in the context of loud snoring by an inmate, not as a complete lack of breathing or some other serious problem.[3]  Manns responded appropriately consistent with that understanding, directing Alexander to talk to Orlowski when he woke.  (*Id.* ¶ 72.)  In addition, he responded immediately to the dorm once Alexander called a medical emergency.  (*Id.* ¶ 96.)  None of these undisputed facts point to a failure by either officer to respond reasonably to the situation as it unfolded that morning, and none supports a claim of deliberate indifference.

## III. PLAINTIFFS' *MONELL* CLAIMS ALL LACK SPECIFIC, REQUIRED ELEMENTS.

### A. Plaintiffs' Custom and Practice Claims Fail to Show the Requisite Notice.

Plaintiffs allege that Milwaukee County had several improper customs and practices that led to Orlowski's death:  (1) a failure to properly check inmates' mouths during the distribution of medications; (2) a failure to properly supervise or monitor inmates for signs of intoxication; and (3) a custom of "condoning" widespread practice of selling mediations.  However, even

---

[3] Plaintiffs argue that the County's 30(b)(6) representative indicated that a medical emergency should be called if an HOC inmate were found not to be breathing.  (PPFOF ¶ 27.)  However, the context of the testimony was the discovery of an inmate who was lying on the floor and not breathing, not one sleeping in bed, snoring, and breathing irregularly.  (Simatic Decl., Ex. G at 143:6 – 144:5.)

assuming that nurses or officers were at times not properly checking mouths, officers were at times not properly supervising inmates, and inmates were selling mediations—none of which defendants concede actually occurred—plaintiffs' claims still suffer from a lack of notice at the policy making level, which dooms the claims.

As an initial matter, plaintiffs make liberal use of a *2008* National Institute of Corrections ("NIC") report that the HOC requested to improve its operations in an effort to show that the HOC administration condoned the conditions that allegedly led to Orlowski' s death. However, plaintiffs' reliance on the NIC report is flawed for two reasons. First, the NIC report contains no criticisms on issues related to medication distribution, identification of inmates using drugs, and inmates selling medications at the HOC—the very issues central to plaintiffs' claims. Second, the NIC report could not possibly have put County policymakers on notice of the problems identified therein prior to Orlowski' s death. In fact, it is undisputed that the NIC report was published and available to the HOC only in January 2008—at least two months after Orlowski' s November 22, 2007 death. (DPFOF ¶ 34.)

To sustain a *Monell* claim on the basis of a custom or practice, a plaintiff must link the custom to an officer or body at the policymaking level. Liability only arises from "execution of a government's policy or custom, whether made by its lawmakers or by those . . . said to represent official policy." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). Claiming a custom or practice is insufficient; plaintiffs must demonstrate a **Milwaukee County** custom or practice. *Latuszkin v. City of Chi.*, 250 F.3d 502 (7th Cir. 2001). *Latuszkin* involved a custom and practice claim after a drunk police officer struck and killed the plaintiff's wife. *Id.* at 503. The plaintiff had alleged that members of the Chicago Police Department had a custom and practice of holding parties wherein officers would become intoxicated and drive. *Id.* The

Seventh Circuit dismissed the claim, stating that it only established a custom and practice of the Chicago Police Department. *Id.* at 505.

> The complaint does not allege any facts tending to show that City policymakers were aware of the behavior of the officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior . . . . Without a link between the City and the alleged policy, no claim for municipal liability can survive.

*Id.*

In the present matter, plaintiffs make no allegations, and offer no evidence, that the HOC administration was aware that nurses or officers were at times not properly conducting mouth inspections of inmates—in violation of an express written policy. Moreover, even if plaintiffs made those allegations, there is no evidence or allegation that ***Milwaukee County policymakers*** were aware, or should have been aware, that some nurses and corrections officers were purportedly failing to properly conduct mouth inspections of inmates after administering mediation. The notice required by cases such as *Monell* and *Latuszkin* is conspicuously absent.

The same fundamental flaw applies to plaintiffs' custom and practice claim pertaining to the alleged failure to adequately supervise or monitor inmates for signs of drug abuse or intoxication. Even if the Court adopts plaintiffs' logic, borrowed from the NIC report, that dorm officers failed to "get to know inmates," which then precluded them from recognizing Orlowski's signs of methadone abuse, there is still a complete lack of any allegation or evidence that Milwaukee County policymakers were aware of any such custom and practice, let alone that they were aware that it was causing constitutional violations.

Finally, even assuming that inmates were selling and trading medications inside the HOC, plaintiffs—once again—fail to allege any actual or constructive notice on the part of policymakers at the County. Plaintiffs claim that County officials had a practice of "condoning" the sale and trading of medications. However, plaintiffs offer no evidence to support the bald

assertion other than the same, recycled arguments to support the other custom and practice claims. There is no evidence that any policymakers for the County knew, or had constructive notice, of trading and selling of medications at the HOC in 2007.

Notice is key to a custom and practice claim. *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) ("liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission . . . is likely to result in constitutional violations"); *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) ("plaintiff may show deliberate indifference through 'a series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees"). Plaintiffs have shown nothing to satisfy this fundamental element, so their *Monell* claims must fail.

### B. Plaintiff's Failure to Train and Supervise Claims are Deficient.

There is no dispute that the HOC officers met the State of Wisconsin training standards. (DPFOF ¶ 6.) Plaintiffs argue, that despite the Seventh Circuit's decision in *Tapia v. City of Greenwood¸* a jury can still impose liability against the County. 965 F.2d 336 (7th Cir. 1992). In other words, according to plaintiffs, the County is required to establish higher standards for training its officers in how to respond to "medical emergencies" than what the State requires for all other jail officers in Wisconsin. Indeed, what plaintiffs really contend is that the County should be held liable for failing to train its officers on how to diagnose sleep disorders. Yet, under *Tapia,* plaintiffs' claim necessarily fails because they offer no proof that the County was on notice that the training it required of all jail officers was deficient because it did not include this enhanced, specific medical training (and even though it was providing all of the training required by the State of Wisconsin). *Id.* at 339.

Plaintiffs next contend that the County is liable for failing to properly train its personnel on how to look into an inmate's mouth when administering medication. But the crux of his argument is that some HOC personnel failed to properly follow the County's formal written policy on medication distribution. Again, however, absent proof of notice to the County that its clear, written directive to staff to check inmates' mouths when administering medications was not being followed as a matter of course, no *Monell* claim exists against the County.

In turn, plaintiffs' failure to supervise claim relies heavily on generic statements from the NIC report such as "[t]o a large extent at HOC, supervisors don't supervise and managers don't manage." Plaintiffs correctly anticipated problems with their vague supervision claims. They note that the NIC report has "139 pages of detailed criticisms." However, none of those 139 pages of criticisms reference medication administration, medical training for officers, or any of the claims plaintiffs raise in this suit. Moreover, taking a step back, there is no evidence that Milwaukee County policymakers were aware of the litany of generic criticisms before Orlowski's death, as *Monell* requires.

## IV. THE LOSS OF FAMILIAL RELATIONSHIP CLAIM MUST BE DISMISSED.

In *Russ v. Watts*, the Seventh Circuit reexamined Supreme Court precedent and concluded that a prior decision to recognize a parental liberty interest where police action incidentally terminated a parent-child relationship was not well-grounded. 414 F.3d 783, 790-91 (7th Cir. 2005). In doing so, the court stated that "'[h]istorically, the guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.'" *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (alterations and emphasis in original). Notably, *Russ*'s requirement of the need for deliberate state action aimed at terminating the parent-child relationship does not distinguish between adult and minor children. *Id.*; *see also Valdez v. Ind. State Prison*, No. 2:11-CV-484, 2012 WL 3921445, at \*4

(N.D. Ind. Sept. 7, 2012). Accordingly, *Russ*'s analysis that courts have not recognized due process violations short of conduct aimed at terminating the parent-child relationship applies equally to any age child. Plaintiffs provide no case law to support a contrary conclusion.[4] Gary Orlowski's claim thus fails because he has not alleged, nor could he show, that the conduct of defendants was for the specific purpose of depriving him of his familial relationship with his son.

## CONCLUSION

For all of the foregoing reasons, and as is more fully explained in their initial brief in support of summary judgment, defendants submit that this Court should grant their motion for summary judgment, deny plaintiffs' request for summary judgment, and dismiss plaintiffs' claims against them in their entirety.

Dated this 8th day of February, 2016.

    s/ Kurt M. Simatic
    Charles H. Bohl
    Andrew A. Jones
    Kurt M. Simatic
    Attorneys for Defendants
    WHYTE HIRSCHBOECK DUDEK S.C.
    555 East Wells Street, Suite 1900
    Milwaukee, Wisconsin 53202-3819
    Telephone: 414-273-2100
    Fax: 414-223-5000
    Email: cbohl@whdlaw.com
    Email: ajones@whdlaw.com
    Email: ksimatic@whdlaw.com

---

[4] Plaintiffs only cite to an unrelated portion of the United States Code that defines adult as someone at least 21 for purposes of mailing tobacco products. However, plaintiffs might just as well have pointed to the 26th Amendment, which defines the minimum voting age as 18. Moreover, Wisconsin defines an adult as someone at least 18 years old. Wis. Stat. § 990.01(3).