UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GARY ORLOWSKI, individually, and                    Case No. 13-cv-1318-PP
ESTATE OF ALEXANDER L. ORLOWSKI,
by Special Administrator Gary Orlowski,

                Plaintiffs,

v.

MILWAUKEE COUNTY,
IRBY ALEXANDER, and ANTHONY MANNS,

                Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 45) AND DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE
DEFENDANTS' IMPROPER PLEADING (DKT. NO. 64)**

---

Gary Orlowski, individually and as the special administrator of the estate

of his deceased son, Alexander Orlowski, filed a civil rights action under 42

U.S.C. §1983 against Milwaukee County and three individuals who were

employed as correctional officers at the Milwaukee County House of Correction

("the HOC")—Irby Alexander, Anthony Manns and Ronald Malone. Dkt. No. 1.

The plaintiff's claims arise out of the death of his son, Alexander Orlowski ("Mr.

Orlowski"). Mr. Orlowski died from a fatal methadone overdose on November

22, 2007, while incarcerated at the HOC. The plaintiff pleaded §1983 claims

based on the conditions of Mr. Orlowski's confinement, failure to provide

medical care, and loss of familial relationship, society and companionship. He

pleaded §1983 claims against the County under <u>Monell v. Department of Social

Services</u>, 436 U.S. 658 (1978), as well as a state law indemnification claim.

1

The defendants have moved for summary judgment as to all of the plaintiff's claims. In response to the defendants' motion, the plaintiff dismissed "all claims against [defendant Ronald Malone], because there is no evidence [he] was individually involved in the events" preceding Orlowski's death. Dkt. No. 51 at 1. Otherwise, the plaintiff opposed the defendants' motion. Invoking Rule 56(f)(1), the plaintiff's opposing brief argued that the court ought to deny the defendants' motion for summary judgment, and instead award summary judgment in his favor. Dkt. No. 51 at 3-4. The plaintiff contended that, even though he had not moved for summary judgment on or before the December 18, 2015 deadline the court had set in the scheduling order, he could ask the court to award summary judgment under Rule 56(f) because he notified the defendants in a motion for leave to file statements of additional fact that he planned to request summary judgment in his response to the defendants' motion for summary judgment. Id. at 2-3. The plaintiff also moved to strike the defendants' reply to the plaintiff's responses to the defendants' statements of fact. Dkt. No. 64.

For the reasons explained below, the court will grant the defendants' motion for summary judgment as to all of the plaintiff's claims, decline the plaintiff's request that it award summary judgment in his favor, and deny the plaintiff's motion to strike the defendants' reply to the plaintiff's responses to the defendants' proposed statements of fact.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Undisputed Facts

Mr. Orlowski was incarcerated at the HOC from July 8, 2007 to November 22, 2007, serving a sentence for violating the terms of his probation related to a conviction for burglary of a building or dwelling. Dkt. No. 52 at 14, ¶¶42-43 (Pl's Resp. to Def's Stm. of Facts).

On the morning of November 22, 2007, Mr. Orlowski was asleep in his bed (bed 14) in the Zebra-2 dorm. Id. at ¶44. Defendant Alexander, a corrections officer, began his shift as the dorm supervisor for the Zebra-2 dorm at 12:05 A.M. on that day. Id. at 15, ¶45. At that time, the inmates in Zebra-2 dorm already were in their beds. Id. at ¶46. The Zebra-2 dorm log book reflects that, around 12:28 A.M. and again at 1:36 A.M., Alexander conducted security checks of the dorm. Id. at 16, ¶¶49-52. Also around 1:36 A.M., defendant Manns, a corrections officer and Alexander's supervisor, toured the dorm. Id. at 17, ¶54. Neither Alexander nor Manns made an entry in the log book pertaining to Mr. Orlowski at those times. Id. at 16-17, ¶¶51-55.

At approximately 4:00 A.M., Alexander noted in the Zebra-2 dorm log book:

> $Z^2$14 Orlowski #719775403 appears to have a severe sleeping disorder. Inmate appears not to be breathing at times. Inmate makes a lot of noise while trying to breath [sic] and or when he is breathing. Inmate appears to have a lot of difficulties sleeping. Sgt Manns Notified about $Z^2$14 Orlow[ski].

Id. at 19, ¶60; Dkt. No. 47-7 at 3. Alexander testified at his deposition that he had not encountered Mr. Orlowski before January 22, 2007. Dkt. No. 48-2 at

3

208. Alexander's 4:00 A.M. log book entry reflects the first time Alexander had noticed that Mr. Orlowski was having any problems. Id. At that time, Alexander contacted Manns via his radio to discuss his observations of Mr. Orlowski. Id. at 208-09. Alexander testified that he told Manns that he was concerned about Mr. Orlowski, and Manns replied that either Alexander could talk to Orlowski at breakfast, or both of them could talk to Orlowski in the morning, to "ask him if he, you know, knew that—how he was sleeping." Id. at 209. Alexander testified that he was concerned that Mr. Orlowski might have a sleep disorder, such as sleep apnea, and was concerned that the loud noises Mr. Orlowski was making during his sleep would affect other inmates in the dorm or potentially lead to a fight. Id. at 208-18.

In response to the plaintiff's counsel's questions regarding what caused Alexander to believe Mr. Orlowski had a severe sleeping disorder, Alexander testified that "[t]he loud snoring was the key. This intermittent-type breathing type thing was, you know, another kind of indicator that, you know, there was some type of thing—issue going." Id. at 210. Alexander explained that "[i]t seemed like he stopped breathing . . . And then all of a sudden a loud roar come out. And, you know, seemed to be some agitation at times that—that he had." Id. at 210.

At some time on November 22, 2007 (the exact time is not clear from the record), Alexander tried to rouse Mr. Orlowski by shaking his bed and calling his name. Id. at 210, 238. Alexander testified that Mr. Orlowski made a load roar, which startled him and made him jump. Id. at 211. He indicated that

4

some other inmates laughed at his response to the roar, saying, "Oh, he sleeps like that all the time." Id. In response to Alexander shaking his bed and calling his name, Mr. Orlowski would or change his breathing pattern from hard to soft, as if Alexander was disturbing his sleep, but Mr. Orlowski did not wake up. Id. Alexander testified that Mr. Orlowski's sleep disturbances reminded him of sleep apnea, and that he was aware of inmates who suffered from sleep apnea and who displayed symptoms such as trembling and "all kind of, like, activities." Id. at 217. Alexander indicated that there wasn't anything officers could do when they saw those inmates behave in that fashion, other than to think, "Man, these guys need a CPAP;" he testified that there were other inmates who had CPAP machines. Id. at 217-218. The record does not reflect that Alexander made any other attempts to wake up Mr. Orlowski.

Manns prepared an incident report after Mr. Orlowski had died in which he described his discussion with Alexander. Dkt. 48-4 at 151. Manns testified that he wrote that Alexander reported "that inmates in Z dorm was complaining about Inmate Orlowski. Alexander with his number, Z14 sleeping behavior that he was snoring too loud." Id. Manns further testified that he wrote that Alexander "went to Orlowski . . . and observed this inmate's chest and stomach go up and down and at times his body would make sudden moves but he was breathing okay." Id. at 152. Based on the information Manns received from Alexander, he testified that, at that time, he did not believe that Alexander had any concerns about Mr. Orlowski's "health or breathing conditions or intermittent breathing or anything like that." Id. at 167. Manns further testified

5

that he did not believe that Mr. Orlowski had "any type of sleeping or medical condition," based on the information provided to him by Alexander. Id. at 178; see also, id. at 162-65. Manns advised Alexander "to keep a close watch on him and . . . And if [Orlowski] gets up for breakfast, you should talk to him. And if he don't get up for breakfast, you should wake him up this morning and ask him if he is aware of the way he sleeps." Id. at 152. Manns expected that Alexander would ask Mr. Orlowski if he had any sleeping disorders or if Mr. Orlowski was aware that he snored very loudly when he slept. Id. at 179-80.

Manns denied that Alexander told him that Mr. Orlowski appeared not to be breathing. Id. at 181-82. Manns testified that if Alexander "would've said the inmate was not breathing, we would've called a medical emergency." Id. at 181. Manns expanded on that testimony by explaining that "[i]f Alexander would've told me that an inmate is not breathing, I would've told him to call a medical emergency. Simple as that. And I would've ran down to the area immediately to assist." Id. at 184. Bonnie Crissey, Milwaukee County's corporate representative, testified in her deposition testimony that a correctional officer has the discretion to call a medical emergency "[i]f a correctional officer can't wake someone up without knowing why[.]" Dkt. No. 48-7 at 140-41. Alexander did not contact Manns again, and Manns was not present again in the Zebra-2 dorm until after Mr. Orlowski was found to be unresponsive at about 6:10 A.M. Dkt. No. 52 at 24, ¶73; 28, ¶96.

The log book indicates that breakfast was announced at 4:05 A.M., and seventeen Zebra-2 dorm inmates went to breakfast at 4:20 A.M. Dkt. No. 48-2

at 211. The defendants do not dispute that the HOC's written policy required Mr. Orlowski to wake up and go to breakfast. Dkt. No. 59 at 6, ¶22. Mr. Orlowski had been assigned to work in the kitchen that morning, but Alexander did not wake him for breakfast because there were more inmates who were assigned or volunteered to work than were needed. Id. Larry Green, an HOC inmate housed in the Zebra-2 dorm who was assigned as the head cook in the HOC kitchen, stated in his affidavit that he tried to wake Mr. Orlowski up for his shift as a morning kitchen worker, but that Mr. Orlowski would not wake up. Dkt. No. 56 at ¶16-17. Green further stated that it was unusual for Mr. Orlowski not to wake for his shift, and that he repeatedly "told an HOC correctional officer that something was wrong with Alex." Id. at ¶¶18-20. The defendants dispute that Green made these statements to Alexander, but they do not dispute that Green made these statements to some HOC corrections officer. Dkt. No. 59 at 5, ¶¶18-19.

At 4:35 A.M., Corrections Manager Virginia Ertman, the highest ranking correctional officer on duty that night, toured the dorm and read Alexander's 4:00 A.M. log entry regarding Mr. Orlowski. Dkt. No. 52 at 25, ¶¶78-80. Alexander and Ertman went to observe Mr. Orlowski, and at that time, he was breathing and sleeping. Id. at ¶82; Dkt. No. 48-6 at 145-46. Ertman testified that she could tell Mr. Orlowski was breathing "[b]ecause his chest was going up and down." Dkt. No. 48-6 at 144. According to the log book and his deposition testimony, Alexander conducted security checks on the inmates of Zebra-2 dorm at approximately 4:45 A.M, 4:55 A.M., and 5:48 A.M. Dkt. No. 52

7

at 26-27, ¶¶84-85, 88. During that period of time, Alexander "didn't see anything" that would have given him reason to believe "that [Mr. Orlowski] could've been in any physical distress." Dkt. No. 48-2 at 255.

At about 6:10 A.M., as the inmates were returning from breakfast, Alexander heard several inmates call out, "Man down, man down." <u>Id.</u> at 251; Dkt. No. 52 at 27, ¶¶90-91. Alexander testified that he didn't understand what that phrase meant, and he interpreted it literally to mean that a person had fallen out of his bunk. Dkt. No. 48-2 at 255-56. When Alexander reached Mr. Orlowski's bunk, he observed that Mr. Orlowski's face was "stiff" and "solid," and "so still that something was wrong. And it just made me just call out for help." <u>Id.</u> at 258. Alexander testified that at 6:12 A.M., he called a medical emergency and added "an enhancement" to the urgency of the situation by stating that those responding should "step to," as in "come here right away." Dkt. No. 52 at 28, ¶95; Dkt. No. 48-2 at 259-60. Resuscitation efforts were unsuccessful, and at 6:54 A.M., Mr. Orlowski was pronounced dead. Dkt. No. 52 at 28, ¶99. An investigation into Mr. Orlowski's death determined that he had obtained methadone and Seroquel from another inmate or inmates prior to his death. Dkt. No. 52 at 29, ¶101 and Response No. 101. The parties agree that Mr. Orlowski "died as a result of a drug overdose." Dkt. No. 52 at 30, ¶102. The Milwaukee County Medical Examiner determined that methadone toxicity caused Mr. Orlowski's death. Dkt. No. 53-1 at 42.

In 2007, the HOC had a written policy and procedure for medication distribution, which required "that only licensed health care staff could

administer medication to inmates." Dkt. No. 52 at 6-7, ¶¶20-21. Under that policy, the "health care staff were stationed just outside the entrance to the dormitory," where the inmates received their medication, and corrections staff "were stationed in the threshold of the entrance so that they could monitor the dormitory and the inmate receiving medication." Id. at 7, ¶24. After an inmate received medication, the inmate was to open his mouth "after swallowing oral medication to allow a visual inspection of the mouth by health care staff and correctional staff to ensure the inmate has swallowed the medication." Id. at 8, ¶26 (alterations omitted).

Samuel Pelkey, a Zebra-2 dorm inmate during the time period relevant to this case, stated in his affidavit that another Zebra-2 dorm inmate, Samuel Fitzpatrick, was able to "cheek" his methadone pills (by hiding them in his mouth instead of swallowing them) because the HOC employees failed to adequately check Fitzpatrick's mouth. Dkt. No. 59 at 8-9, ¶¶35, 37-38. Henry Delgado, another Zebra-2 dorm inmate during the time period relevant to this case, stated in his affidavit that "[a]t times when HOC nurses administered methadone pills to Fitzpatrick," he saw Fitzpatrick "take the pills out of his mouth and put them in his hand." Id. at 10, ¶40. Pelkey stated that over at least a two-day period of time, between November 19 and November 21, 2007, Fitzpatrick sold his methadone pills to Mr. Orlowski. Id. at 11, ¶46. One of the defendants' experts, Dr. Chad Zawitz, testified "that it would have been standard practice for a correctional facility such as the HOC to house an

9

inmate who was receiving methadone in a medical unit instead of the general population, to prevent diversion of methadone to other inmates." Id. at 13, ¶54.

Kristen Babe, an HOC nurse, told Ertman after Mr. Orlowski had died that she knew Mr. Fitzpatrick had "a history of selling his meds." Dkt. No. 59 at 12, ¶50. Nurse Babe testified in her deposition that she could not recall how she learned that Mr. Fitzpatrick had previously sold his medications, and she was unaware of whether any other correctional officers or supervisors were aware of that before Mr. Orlowski died. Dkt. No. 48-8 at 98-100. She further testified that it was "a classic thing" for inmates to horde medication and sell it in the dorm for canteen. Id. at 97. Amy Lynn Hazen, a former nurse at HOC, testified that, in 2007, "[a]t least 90 percent of our officers [in 2007] never checked" the mouths of inmates when medication was distributed, but she did not recall complaining about that practice to a supervisor in 2007. Dkt. No. 53-1 at 176.

On April 1, 2008, Fitzpatrick later was charged in Milwaukee County Circuit Court with one count of first degree reckless homicide, a felony, based on allegations that he supplied Mr. Orlowski with methadone prior to his death. Id. at 152-54. While the criminal investigation revealed that Mr. Orlowski had not been prescribed methadone, an inmate told investigating officers that he had seen Mr. Orlowski in possession of four or five methadone pills the day before his death, and another inmate told an officer that an inmate (whom police identified as Fitzpatrick) had been supplying Mr. Orlowski with methadone in exchange for bags of chips. Id.

B.   Standards of Review

1.   *Summary Judgment*

A court must grant summary judgment when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A court appropriately grants summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted). "A party will be successful in opposing summary judgment only when that party presents definite, competent evidence to rebut the motion." EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000).

Material facts are those "facts that might affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine if a reasonable jury could find in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party opposing summary judgment cannot simply rest on allegations or denials in its pleadings; it must also "introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial." Anders v. Waste Mgm't of Wis., 463 F.3d 670, 675 (7th Cir. 2006). The court views all facts and draws all reasonable inferences in

11

favor of the nonmoving party, but "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." <u>Herzog v. Graphic Packaging Int'l, Inc.</u>, 742 F.3d 802, 806 (7th Cir. 2014) (quoting <u>Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.</u>, 517 F.3d 470, 473 (7th Cir. 2008)).

       2.   *Section 1983 Claims*

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. <u>Buchanan-Moore v. Cnty. of Milwaukee</u>, 570 F.3d 824, 827 (7th Cir. 2009) (citing <u>Kramer v. Vill. of N. Fond du Lac</u>, 384 F.3d 856, 861 (7th Cir. 2004)); <u>see also</u> <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980).

C.   <u>Discussion</u>

       1.   Defendants Alexander and Manns Are Entitled To Summary Judgment on Claims One Through Five.

To survive summary judgment on his §1983 claims against the individual defendants, the plaintiff must produce evidence that on November 22, 2007, Alexander or Manns violated Mr. Orlowski's constitutional rights.

a. Eighth Amendment Conditions of Confinement Claim[1]

The first §1983 claim in the complaint is entitled "Prison/Jail Conditions of Confinement," and alleges that the defendants violated the Eighth Amendment[2] by housing the plaintiff under conditions that posed a substantial risk of serious harm to his health and safety. Dkt. No. 1 at 28-29. "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." Pyles v. Fahim, 771 F.3d 403, 408-09 (7th Cir. 2014) (citing Whitley v. Albers, 475 U.S. 312, 325 (1986)).

"Confinement in a prison . . . is a form of punishment subject to scrutiny under the Eighth Amendment standards." Rhodes v. Chapman, 452 U.S. 337, 345 (1981) (quoting Hutto v. Finney, 437 U.S. 678, 685 (1978)). While the "Constitution 'does not mandate comfortable prisons,'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes, 452 U.S. at 349), it does impose on prison officials the duty to "provide humane conditions of confinement; prison

_____

[1] The plaintiff argues that the defendants "waived any argument regarding the Plaintiff's conditions of confinement claim by failing to develop any such argument in" their initial brief. Dkt. No. 51 at 27. The court rejects this argument. In their initial brief, the defendants addressed the plaintiff's conditions of confinement claim, and argued that the court should grant summary judgment in their favor on both the plaintiff's conditions of confinement claim and his failure to provide adequate medical care claim (both of which are governed by the deliberate indifference standard). Dkt. No. 49 at 3-5, 23-27.
[2] While the complaint categorized the plaintiff's first two constitutional claims under the "Eighth and Fourteenth Amendments," and then listed the particular type of violation alleged, the court must analyze Mr. Orlowski's first and second claims under the Eighth Amendment. In Lewis v. Downey, 581 F.3d 467, 473 (7th Cir. 2009), the court noted that it is the Eighth Amendment that protects sentenced prisoners "from the infliction of cruel and unusual punishment," while prisoners who are awaiting sentencing and judgment find protection under the Fourteenth Amendment's due process clause.

officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates,'" id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). The Eighth Amendment also imposes on prison officials a duty "to protect prisoners from violence at the hands of other prisoners." Id. at 833 (internal quote omitted).

In order for a plaintiff to prove that a prison official has violated the Eighth Amendment, the plaintiff must meet two requirements. "First, the [constitutional] deprivation alleged must be, objectively, 'sufficiently serious.'" Id. (quotation omitted). The official's "act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Id. at 834 (quoting Rhodes, 452 U.S. at 347). If the inmate alleges that prison officials failed to protect him from harm, he must "show that he is incarcerated under conditions  posing a substantial risk of serious harm." Id. Second, the prison official "must have a 'sufficiently culpable state of mind.'" Id. (quotation omitted). In cases challenging an inmate's conditions of confinement, that state of mind "is one of 'deliberate indifference' to inmate health or safety." Id. (quotation omitted).

Nothing in the record supports a conditions of confinement claim against defendants Alexander or Mann. The evidence indicates that these two defendants interacted with Mr. Orlowski over a period of approximately six hours on November 22, 2007. There are no allegations that during that time, either of them deprived Mr. Orlowski of food, clothing or shelter, or that they

14

failed to protect him from violence at the hands of other inmates. Nor does the record contain evidence that Alexander or Manns showed, in that six-hour time span, deliberate indifference to conditions that exposed Mr. Orlowski to a substantial risk of serious harm. The plaintiff's conditions of confinement claim as to Alexander and Manns is misplaced, and the court will grant summary judgment in their favor on the first claim.

b.     Failure to Provide Medical Attention Claim

The second Eighth Amendment claim in the complaint is entitled "Failure to Provide Medical Attention." Dkt. No. 1 at 30. The complaint alleges that the plaintiff had a serious medical need, to which the defendants were deliberately indifferent. Id. In order to prove that a prison official violated an inmate's Eighth Amendment rights by failing to treat a medical condition, the inmate must show that he had a serious medical need and that the defendant was deliberately indifferent to it. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001).

i.     **Serious medical condition**

A "serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." Hayes v. Snyder, 546 F.3d 516, 522 (7th Cir. 2008) (quoting Greeno v. Daley, 414 F.3d 645, 652 (7th Cir. 2005)). A medical need is serious when "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Id. (quoting Gutierrez v. Peters, 111 F.3d 1364, 1373

15

(7th Cir. 1997)). A prisoner's circumstances indicate a serious medical need with "[t]he existence of an injury that a reasonable doctor or patient would find important and worth of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Id.

During the six-hour period in which the individual defendants were involved with Mr. Orlowski, they believed that Mr. Orlowski was suffering from sleep apnea. After Mr. Orlowski's death, investigation revealed that he had died of a methadone overdose. There is no dispute that, before he died, Mr. Orlowski had not been diagnosed with sleep apnea, a drug overdose or any other serious medical condition. In order to determine the "serious medical condition" prong of the plaintiff's claim, then, the court must determine whether Mr. Orlowski's condition was sufficiently obvious that a layperson would have perceived the need for medical attention. As the Seventh Circuit has put it, the court must look at whether "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Steele v. Choi, 82 F.3d 175, 179 (7th Cir. 1996) (quoting Farmer, 511 U.S. at 842)). A serious medical condition may not be *per se* obvious to a layperson, even when it results in death. Jones v. Minn. Dep't of Corrs., 512 F.3d 478, 483 (8th Cir. 2008) (citing Grayson v. Ross, 454 F.3d 802, 809-10 (8th Cir. 2005) (no objectively serious medical need because it would not have been obvious to a layperson that an inmate required immediate medical attention even though intoxication resulted in death)). But an inmate has a right to prompt medical

16

attention "in life and death situations." <u>Mathison v. Moats</u>, 812 F.3d 594, 597 (7th Cir. 2016).

Relying on <u>Dortch v. Davis</u>, No. 11-cv-841, 2014 WL 1125588 (S.D. Ill. Mar 21, 2013), the plaintiff argues the court should find that sleep apnea is a serious medical condition. Dkt. No. 51 at 6. More than one court has found that sleep apnea is, in fact, a serious medical condition. <u>See</u> <u>Dortch</u>, 2014 WL 1125588 at *5 (finding that plaintiff who had been diagnosed by a doctor with sleep apnea suffered from a serious medical condition); <u>Meloy v. Schuetzle</u>, 230 F.3d 1363 (7th Cir. 2000) ("obstructive" sleep apnea found to be a serious medical condition). This court agrees that sleep apnea may constitute a serious medical condition.

At least one district court in the Seventh Circuit has implied that a drug overdose, such as the one Mr. Orlowski suffered, constitutes a serious medical condition. In <u>Estate of Crouch v. Madison County</u>, 682 F. Supp. 862, 872 (S.D. Ind. 2010), an inmate died of a drug overdose. The record indicated that the inmate had shown signs of being under the influence of drugs prior to his death, but Judge Sarah Evans Barker stated that the record failed to reflect "signs that he was suffering from a more serious drug-related condition, such as an overdose . . . ." This statement implies that a court might consider a drug overdose to be a serious medical condition. Certainly failure to treat a drug overdose could result in pain, more serious injury, or death. Thus, this court concludes that a drug overdose is a serious medical condition, and that an inmate suffering from an overdose has a serious medical need.

Case 2:13-cv-01318-PP   Filed 04/21/16   Page 17 of 47   Document 75

## ii. **Deliberate indifference**

It is the second prong of the failure-to-provide-medical-treatment test which causes the plaintiff's claims against the individual defendants to fail. A prison official is deliberately indifferent to an inmate's serious medical need "when he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Deliberate indifference requires more than a showing of mere negligence: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." Id. at 838. The Supreme Court has interpreted the deliberate indifference standard to require a "reckless[] disregard[]" of "a substantial risk of serious harm to a prisoner . . . ." Id. at 836.

> [I]t is not enough for a plaintiff to show that the official acted negligently or that he . . . should have known about the risk. Instead, the [plaintiff] must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference.

Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008) (internal citations omitted); see also Whiting v. Marathon County Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004) ("Farmer, since it requires the defendant-official to have actual knowledge of the risk, foreclosed imputed knowledge as the basis for an Eighth Amendment claim of deliberate indifference.").

18

At or about 4:00 A.M. on November 22, 2007, Alexander observed that Mr. Orlowski was having a lot of difficulty sleeping, that he was making loud noises while sleeping, and that he was not breathing at times. Alexander testified at his deposition that he thought Mr. Orlowski's sleep difficulties were attributable to sleep apnea, that inmates with sleep apnea needed a CPAP mask to help them breathe while asleep, and that he was concerned that Mr. Orlowski's sleep disturbances would wake up other inmates in the dorm.

The parties do not dispute that Mr. Orlowski's symptoms were consistent with sleep apnea. And it is undisputed that Alexander responded to Mr. Orlowski's apparent sleep difficulties. Because he was concerned about the noises that Mr. Orlowski was making, and the intermittent nature of his breathing pattern, shook Mr. Orlowski and called his name, causing Mr. Orlowski to change his sleeping position and breathing pattern. Alexander contacted Manns, explained his observations, and asked for advice. After speaking with Manns, Officer Alexander continued to monitor Mr. Orlowski. At about 4:35, A.M., Alexander visited Mr. Orlowski's bunk with Ertman. At that time, Mr. Orlowski appeared to be sleeping; the officers noticed his chest moving up and down. And, at that time, Mr. Orlowski was not exhibiting signs or symptoms suggesting that he was in medical distress. After that visit, Alexander checked on Mr. Orlowski repeatedly; the log book reflects that Alexander checked on Mr. Orlowski at about 4:45 A.M, 4:55 A.M., and 5:48 A.M. Alexander testified that, at those times, Mr. Orlowski did not exhibit any other signs or symptoms showing that he was in distress or that he obviously

19

needed immediate medical attention. At some point between 5:48 A.M. and 6:12 A.M., Mr. Orlowski stopped breathing and died.

This record contains no evidence that the officers had reason to believe that Mr. Orlowski was suffering from a serious medical need between 4:00 a.m. and 6:10 a.m., or that they intentionally or recklessly disregarded that need. From the moment Alexander noticed that Mr. Orlowski was breathing oddly, he took action. He noted the fact in the log book. He consulted with his supervisor, Manns, and they discussed a plan of action (monitoring Mr. Orlowski until breakfast, and then discussing with Mr. Orlowski whether he was aware of the symptoms he was exhibiting). He both shook Mr. Orlowski and called his name; the fact that Mr. Orlowski moved and changed his breathing patterns in response gave Alexander no reason to believe that Mr. Orlowski was suffering from a serious medical need at that time. Every time Alexander checked in on Mr. Orlowski—including the occasion on which he took Ertman with him—Mr. Orlowski was breathing, and appeared to be sleeping. [3]

The record shows that Alexander had discretion in these circumstances to determine whether to call a medical emergency. Dkt. No. 48-7 at 140-41. But as the evidence indicates, while Alexander had reason to believe that Mr.

---

[3] Alexander testified that on one occasion, other inmates told Alexander (when he reacted to one "roar" by Mr. Orlowski) that Mr. Orlowski slept that way all the time. Dkt. No. 48-2 at 211. In his response to the defendants' proposed findings of fact, the plaintiff objected that there was no contemporaneous evidence supporting this fact, that it was self-serving, and that other inmates had told Alexander that "something was wrong" with Mr. Orlowski. Dkt. No. 52 at 20-21, Response No. 63.

Orlowski might be suffering from sleep apnea, he did not have reason to believe that Mr. Orlowski suffered from a medical emergency, particularly when Mr. Orlowski responded to Alexander shaking him and calling his name. Indeed, Manns testified that he believed Alexander contacted him to discuss Mr. Orlowski because other inmates were complaining about his snoring or loud sleeping, not to report a medical problem. Dkt. No. 48-4 at 164-80.

Inmate Larry Green declared in an affidavit that he told a corrections officer (who the court will infer was Alexander for the purposes of this motion (see Dkt. No. 59 at 5, ¶19)) that "something was wrong" with Mr. Orlowski. That evidence does not demonstrate that Alexander was deliberately indifferent to a known medical risk. Clearly Alexander inferred that something was indeed "wrong" with Mr. Orlowski; the inference that Alexander drew was that Mr. Orlowski had sleep apnea, and he took action once he drew that inference. This is the inverse of deliberate indifference.

The plaintiff asks the court to find deliberate indifference by looking at the facts in Dortch. On the date that Dortch arrived at the jail, he told the defendants that he had been diagnosed with sleep apnea. The plaintiff did not have his CPAP machine when he first arrived at the jail. Upon learning of the plaintiff's diagnosis, one of the medical defendants asked the jail's health care center to obtain the plaintiff's medical records to confirm his past treatment and his need for a CPAP machine. Dortch, 2014 WL 1125588, at *5. The plaintiff's family subsequently located his CPAP machine and sent it to the prison, where it was issued to the plaintiff. Thereafter, health care staff took

appropriate follow-up steps, such as issuing a low bunk permit and supplying replacement parts for the CPAP. Id.

In Dortch, the plaintiff claimed that the defendants were deliberately indifferent to his medical needs by causing a three-month delay between the date he arrived at the jail and the date on which he received his CPAP machine. Id. at *2. Dortch based his §1983 claims on the ensuing delay before he received his CPAP mask; the defendants knew that Dortch had sleep apnea and had requested a particular treatment for that condition.

Dortch does not support the plaintiff's claim. First, the Dortch court granted the defendants' motion for summary judgment, finding that defendants were not deliberately indifferent to the plaintiff's sleep apnea. In other words, the Dortch court did not find deliberate indifference even after a three-month delay in treatment for a condition the defendants knew that the plaintiff had. In the present case, Mr. Orlowski had not been diagnosed with sleep apnea, and neither Alexander nor Manns knew for certain that he was suffering from sleep apnea. They believed, however, based on the plaintiff's behavior, that he might be suffering from sleep apnea, and rather than waiting three months to take action, they took the actions described above right away.

Nor is there any evidence in the record showing that either Alexander or Manns interacted with or knew Mr. Orlowski before the date of his death, or knew that he had used drugs at some point in the week preceding November 22, 2007. While there were inmates who told investigating officers that Fitzpatrick had sold his methadone to Mr. Orlowski, and that Mr. Orlowski was

22

hoarding as many as four or five tablets the day prior to his death, it is undisputed that the inmates did not provide this information to prison officials. Some inmates told investigating officers that prior to November 22, Mr. Orlowski had been acting "high" or "dizzy." Dkt. No. 53-1 at 152-54. Again, there is no evidence that the inmates reported this to prison officials. By the time Alexander had his first contact with Mr. Orlowski, Mr. Orlowski was in bed, asleep. While the record is replete with evidence indicating that Mr. Orlowski was breathing strangely, there is no information in the record to indicate that either Alexander or Manns knew or had reason to know, during the two-hour period that Alexander observed the strange breathing patterns, that Mr. Orlowski might be suffering from a drug overdose.

As discussed earlier, Judge Barker faced somewhat similar facts in Estate of Crouch. That case involved an inmate who was found unresponsive by prison officials at 3:00 a.m. Estate of Crouch, 682 F. Supp. 2d at 867-68. Judge Barker considered whether "Mr. Crouch showed signs of an objectively serious need for medical attention at some point prior to 3:00 a.m. in response to which the named defendants were deliberately indifferent." Id. at 871. Officers had observed behaviors such as slurred speech, unsteady balance, and glassy eyes, from which they inferred that the plaintiff was under the influence of drugs and sleep-deprived. Id. Judge Barker noted, however, that "the mere fact that an individual is exhibiting signs of having taken drugs does not necessarily mean he presents an objectively serious need for medical attention." Id. She went on to review observations of third parties, and to

23

question whether the defendant officers "had sufficient awareness of the third parties' observations" to allow a conclusion that the officers knew of a serious medical need but were deliberately indifferent or reckless. After an exhaustive review of the evidence in the record, she concluded that the officers did not have sufficient facts to allow them to draw the inference of a serious medical need prior to the time they found him unresponsive, and she granted summary judgment in favor of the officers. Id. at 876-77.

The facts here more strongly weigh in favor of granting summary judgment in favor of the defendants. As already discussed, the officers' direct observations of Mr. Orlowski's behavior gave them no reason to believe that he was in the midst of a drug overdose. Alexander arguably was privy to only two third-party observations—Ertman's and the inmates who, according to his deposition testimony, laughed at him when he was startled by Mr. Orlowski's "roar." Ertman observed Mr. Orlowski's chest moving up and down, and concluded that he was breathing. The plaintiff disputes Alexander's testimony that the inmates who laughed at Alexander commented that Mr. Orlowski breathed that way all the time; if the court discounts that third-party observation, then the single third-party observation supports the defendants' observations. While an official may not escape liability by "refus[ing] to verify underlying facts that he strongly suspect[s] to be true or declin[ing] to confirm inferences of risk that he strongly suspected to exist," Farmer, 511 U.S. at 843 n. 8, these observations were insufficient to provide Alexander or Manns with

reason to "strongly suspect" that Mr. Orlowski was suffering from a drug overdose.

In sum, Alexander and Manns are entitled to summary judgment because (1) the evidence is insufficient to establish that they knew or should have known that Mr. Orlowski required immediate medical attention for either sleep apnea or a drug overdose; and (2) the evidence is insufficient to demonstrate that Mr. Orlowski had an obvious need for medical attention that the defendants recognized and to which they were deliberately indifferent, or that they recklessly disregarded. The plaintiff has not shown that a genuine dispute of material fact exists on these issues. Consequently, the court will grant summary judgment in favor of Alexander and Manns on the plaintiff's §1983 claims based on the officers' alleged failure to provide medical attention to Mr. Orlowski.

c. Loss of Familial Relationship, Society and Companionship Claim

The third claim in the complaint cites to the First and Fourteenth Amendments, and states only that the defendants' actions deprived the plaintiff of the familial relationship, society and companionship of his son. Dkt. No. 1 at 38. The First Amendment prohibits Congress from among other things, making laws abridging the right of the people to peaceably assemble. It is true that in 1989, then-district court judge Ann C. Williams held that that right, as applied to the states through the Fourteenth Amendment, protected children's relationships with their siblings form "unjustified interference by the State."

25

<u>Aristotle P. v. Johnson</u>, 721 F. Supp. 1002, 1005 (N.D. Ill. 1989) (quotation omitted).

In 2005, however, the Seventh Circuit held that parents do not have "a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action." <u>Russ v. Watts</u>, 414 F.3d 783, 791 (7th Cir. 2005). In order for a parent to recover on a loss of companionship claim, that parent needs to show that the loss of companionship was caused by a state actor's *intentional* interference with the familial relationship. See <u>Young v. City of Chicago</u>, No. 13-C-5651, 2014 WL 7205585 at *2 (N.D. Ill., Dec. 18, 2014) ((quoting <u>Russ</u>, 414 F.3d at 790 for the proposition that the state action must have been "[f]or the specific purpose of terminating [the decedent's] relationship with his family.") There is no evidence in the record showing that the defendant's actions constituted an intentional effort to interfere with the plaintiff's relationship with Mr. Orlowski.

The court has no doubt that the plaintiff's father has suffered deep, traumatic loss as a result of the death of his son, he has no constitutional right to recover for the loss of relationship and companionship absent evidence of intentional interference with that relationship by the state, and thus the court must grant summary judgment in favor of the defendants as a matter of law on this claim.

      d.    Liability of Supervisor

The fourth claim in the complaint does not mention any constitutional provision. It asserts that Alexander failed to provide Mr. Orlowski with medical

attention, and that Manns "approved, assisted, condoned and/or purposely ignored" Alexander's failure to provide that medical attention. Dkt. No. 1 at 32. Manns was Alexander's supervisor. "The doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." Chavez v. Illinois State Police, 251 F.3d 612, 651 (7th Cir. 2001). "Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 477 (7th Cir. 1977) (citations omitted). In other words, "to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct." Id. (citations omitted). It is not enough for a supervisor to be "merely negligent in failing to detect and prevent subordinates' misconduct . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988) (citations omitted).

As discussed above, Alexander did not violate Mr. Orlowski's Eighth Amendment rights. While Manns was involved in Alexander's conduct— Alexander consulted with him about Mr. Orlowski's strange breathing, and together the two formulated a plan for dealing with it—the conduct in which he was involved did not violate the constitution. Accordingly, there is no legal basis for imposing supervisory liability, and the court will grant summary judgment in favor of the individual defendants on this claim.

2. **Milwaukee County Is Entitled To Summary Judgment As To The Plaintiff's *Monell* Claims**

The plaintiff also named Milwaukee County as a defendant. A municipality can be sued directly under §1983 only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." Monell v. Dept of Soc. Servs., 436 U.S. 658, 69 (1978). To succeed in recovering against the County, the plaintiff must show that he "(1) suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." King v. Kramer, 763 F.3d 635, 649 (7th Cir. 2014) (quoting Ienco v. City of Chicago, 286 F.3d 994, 998 (7th Cir. 2002). Liability under Monell "is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation." Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted). It is only "when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible under § 1983." Id. (internal quotation marks and alteration omitted) (citation omitted).

"The existence of a policy or custom can be established in a number of ways: the plaintiff may point to an express municipal policy responsible for the alleged constitutional injury, or demonstrate that there is a practice that is so

28

widespread that it rises to the level of a custom that can fairly be attributed to the municipality." King, 763 F.3d at 649 (citing Estate of Sims v. Cnty. of Bureau, 506 F.3d 509, 515 (7th Cir. 2007)).

The plaintiff pleaded five separate Monell separate claims against the County, but he is proceeding at this stage only as to three: failure to train, failure to supervise, and the custom of condoning unsafe conditions of confinement. Dkt. No. 51 at 31.[4] The plaintiff did not bring any of these claims against the individual officers, and the court has found that the individual officers are not liable on the claims he did bring against them. Given that, the court first must determine whether it even possible to impose Monell liability on the County in the absence of a finding of liability as to the individual officers.

In Thomas v. Cook County Sheriff's Department, 588 F.3d 445, 449 (7th Cir. 2009), opinion amended and superseded on denial of reh'g, 604 F.3d 293 (7th Cir. 2010), the Seventh Circuit answered that question as follows:

> a municipality can be held liable under Monell, even when its officers are not, unless such a finding would create an *inconsistent* verdict. So, to determine whether the County's liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth.

(citing Heller, 475 U.S. 796, 798–99 (1986)).

---

[4] In his memorandum of law opposing the defendants' motion for summary judgment, the plaintiff agreed to dismiss his Monell claims for failure to discipline and for the custom of failing to provide medical attention. Dkt. No. 51 at 31, n.7. That leaves for resolution only the three claims described above.

a. Failure to Train/Failure to Supervise Claims

Two of the three claims the plaintiff brought against the County are dependent on the liability of the officers. The failure to train claim assumes that the officers violated the plaintiff's constitutional rights because of the County's failure to train them. The failure to supervise claim assumes that the officers violated the plaintiff's constitutional rights because the County failed to supervise them.

The Supreme Court has held that the circumstances under a municipality may be held liable for failure to train are "limited." City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989). "Inadequacy in police training can serve as a basis for liability under Section 1983, but only where the failure to train amounts to deliberate indifference to the citizens the officers encounter." Matthews v. City of East St. Louis, 675 F.3d 703, 709 (7th Cir. 2012). The same is true for failure to supervise claims. Alexander v. City of South Bend, 433 F.3d 550, 557 (7th Cir. 2006) (a municipality may not be held liable under Monell for failure to train adequately or supervise its officers if the plaintiff fails to demonstrate any constitutional violation by a municipal employee). In a situation in which the employee whom the municipality allegedly failed to train is not liable, even those "limited" circumstances disappear. The Seventh Circuit has stated unequivocally that "a municipality cannot be liable under Monell when there is no underlying constitutional violation by a municipal employee." Sallenger v. City of Springfield, Ill., 630 F.3d 499, 504 (7th Cir. 2010).

Because this court has found that the individual officers did not violate Mr. Orlowski's constitutional rights, the court need not reach the question of whether there was a failure to train or to supervise those officers. The court will grant summary judgment in favor of the County as to the failure to train and failure to supervise claims.

b.    Condoning Unsafe Conditions of Confinement Claim

The plaintiff has pleaded one <u>Monell</u> claim, however, that does not depend on the success of his claims against Alexander or Manns: his claim that the County's alleged custom or widespread practice of condoning unsafe conditions of confinement caused Mr. Orlowski's death. This claim rests on the plaintiff's allegations that there was a custom or practice among HOC nurses and correctional officers of failing to properly conduct mouth inspections of inmates receiving medication, which led to a widespread practice of inmates "cheeking" or "palming" medication—hiding a pill in the mouth or hand instead of consuming it—and selling it to other inmates. The plaintiff argues that this practice resulted in Mr. Orlowski's death by methadone overdose. Recognizing that the plaintiff has the burden to prove that the County's alleged custom or practice caused a constitutional violation, the plaintiff argues that the County's custom of condoning the inmates' drug trade was the moving force that caused Mr. Orlowski's death. If the evidence supported this claim, there would be no inconsistency between a finding that the individual defendants are not liable, but that the County is.

In opposition to the defendants' argument that the evidence is not sufficient to establish <u>Monell</u> liability (or withstand their motion for summary judgment), the plaintiff relies on the exhibits attached to the affidavit of the plaintiff's counsel, Jonathan Safran; the affidavits of HOC inmates Samuel Pelkey and Henry Delgado; a January 9, 2008 Operational Review of the Milwaukee House of Correction (which was prepared by the National Institute of Corrections and is a comprehensive review of the operations of HOC, with a particular priority on security issues (the "NIC Report")); portions of the defendants' witnesses' deposition testimony; and a "To The Superintendent" report written by Ertman following Mr. Orlowski's death. Dkt. No. 51 at 37-42.

As discussed in the facts, in 2007 the HOC had a policy which stated that after an inmate received medication, the inmate was to open his mouth "after swallowing oral medication to allow a visual inspection of the mouth by health care staff and correctional staff to ensure the inmate has swallowed the medication." Dkt. No. 52 at 8, ¶26 (alterations omitted). Former nurse Hazan testified that "[w]e have to watch to make sure [the inmates] swallow their pills." Dkt. No. 53-1 at 176. The policy further stated that "[i]f cheeking or palming medications is suspected, inmate opens both hands, spreads fingers, and a more thorough exam of the mouth is completed." Dkt. No. 47-4 at 2. The HOC's stated reasons for having such a policy included the fact that "[c]ontrolled substance abuse in a correctional setting is disruptive and criminal," and that such substance abuse " in the close confines of a secure facility can lead to serious discipline and safety problems." Dkt. No. 47-5 at 1.

According to the plaintiff, the evidence shows that HOC inmates manipulated the HOC's medication distribution program by "cheeking" and "palming" pills, aided by the staff's alleged failure to adequately ensure that an inmate had ingested his medication, and then sold or traded those pills to other inmates. The evidence in the record, viewed in the light most favorable to the plaintiff, shows the following with regard to a custom or practice of nurses failing to check inmates' mouths:

Former HOC nurse Hazan testified that in 2007, "[a]t least 90 percent of our officers [in 2007] never checked" the mouths of inmates when medication was distributed, but that she did not recall complaining about that practice to a supervisor in 2007. Dkt. No. 53-1 at 176. Former inmate Pelkey submitted an affidavit in which he indicated that "HOC inmates were able to hide medication in their mouths, a technique known as 'cheeking,' because HOC nurses did not adequately check to make sure that inmates swallowed their medication." Dkt. No. 55 at 2. Pelkey stated that he, himself, had sometimes "cheeked" his medication (Seroquel). Id. at 3. Former inmate Delgado submitted an affidavit stating that "HOC inmates were able to hide medication in the cheeks and/or under their tongues in their mouths, because some HOC nurses and correctional officers did not always check properly to ensure that inmates swallowed their medication at the time they were given." Dkt. No. 57 at 2. Former inmate Green's affidavit stated that "during med pass, the HOC nurses and correctional officers often would not check inmates' mouths to make sure

that the inmates swallowed the medication and were not 'cheeking' medication." Dkt. No. 56 at 2.

The record also contains evidence regarding the plaintiff's allegation that inmates who "cheeked" medication were selling it to other inmates. Former inmate Pelkey stated in his affidavit that he would sometimes trade the Seroquel he "cheeked" with other inmates. Dkt. No. 55 at 2. Green's affidavit stated that he saw an inmate sell methadone to Mr. Orlowski at least once, and was aware that that inmate was selling methadone to Mr. Orlowski on other occasions. Dkt. No. 56 at 2. In his affidavit, Delgado stated that "it was a regular practice for HOC inmates to sell and trade medications for canteen items," Dkt. No. 57 at 4, and he stated that he was aware that Fitzpatrick was offering to sell his methadone to other inmates for commissary items, id. at 2. HOC Nurse Babe testified in her deposition that it was "a classic thing" for inmates to horde medication and sell it in the dorm for canteen. Dkt. No. 48-8 at 97. She also told Ertman after Mr. Orlowski that she knew Fitzpatrick had "a history of selling his meds." Dkt. No. 59 at 12, ¶50.

Thus, combined evidence from five witnesses supports the plaintiff's claim that there were nurses and inmates who did not check inmates' mouths after giving them medication, that this at least assisted inmates in "cheeking" their medications rather than swallowing them, and that inmates would sell or trade those "cheeked" medications to other inmates. To establish Monell liability, the plaintiff must demonstrate that this evidence proves a "widespread practice that, although not authorized by written law or express municipal

34

policy, is so permanent and well settled as to constitute a 'custom or usage' within the force of law." <u>Lewis v. City of Chicago</u>, 496 F.3d 645, 656 (7th Cir. 2007). The plaintiff's argument rests on the assumption that there was a collection of widespread, well-settled customs or practices. First, it assumes that there was a widespread custom or practice of HOC staff failing to conduct mouth checks after administering medication. Second, it assumes this practice enabled a widespread practice of inmates "cheeking" medication. Third, it assumes that the combination of these two practices allowed inmates to sell and trade medication to other inmates.

At summary judgment, the court does not consider whether the evidence the plaintiff has submitted would be enough to convince a jury that those three practices existed, were widespread, and were well-settled.[5] It is the court's duty only to determine only if the plaintiff has presented sufficient facts to raise a genuine issue at trial. For the purposes of summary judgment, the court finds that the plaintiff has presented facts which support the above assumptions.

Those assumptions, however, are not enough to defeat the summary judgment motion. The first assumption is that a practice existed whereby HOC staff members ignored or disobeyed the mouth-check policy. Even assuming this to be the case, the record is devoid of evidence that the policymaking level of the County had knowledge of the practice and either ignored it, acquiesced

---

[5] The Seventh Circuit has no bright-line rule defining a "widespread custom or practice"—how many occurrences are necessary, for example. <u>Thomas v. Cook Cnt'y Sheriff's Dept.</u>, 604 F.3d 293, 303 (7th Cir. 2009). Rather, the court has held that "the plaintiff must demonstrate that there is a policy at issue rather than a random event." <u>Id.</u>

to it or condoned it. None of the former inmate witnesses indicate that they reported the practice to supervisory staff, or complained about it. While Hazen testified that she told supervisors about the failures to conduct mouth checks, she did not do so in 2007, at the time of the events in this case. There is no evidence that prior to Mr. Orlowski's death, there had been publicized or reported inmate deaths or illnesses resulting from drug overdoses. Without such evidence, the argument that the County bears <u>Monell</u> liability for the practice amounts to an argument that the County should be held vicariously liable, or liable under a *respondeat superior* theory, for the misconduct of its employees. The Seventh Circuit has held that courts cannot impose <u>Monell</u> liability under such a theory. <u>Woodward</u>, 368 F.3d at 927 (quoting <u>Estate of Novack ex rel. v. Cnt'y of Wood</u>, 226 F.3d 525, 530 (7th Cir. 2000)). If the County cannot be held liable for its employees' failure to follow the mouth-check policy, then it follows that the County cannot be held liable for the fact that that failure may allow inmates to "cheek" medication, and then to sell it to other inmates.

The plaintiff argues, however—and one of the former inmate witnesses opined[6]—that the County had to have known what was going on at the HOC, given that it was generally known that inmates were "cheeking" and selling meds. The plaintiff seeks to prove <u>Monell</u> liability by, as the Seventh Circuit has worded it, "showing a series of bad acts and inviting the court to infer from

---

[6] Former inmate Green stated in his affidavit that "the HOC correctional officers should have known that an inmate was selling Methadone to [Mr. Orlowski], because the sales took place near the bunks of the Zebra Two dormitory." Dkt. No. 56 at 2.

them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." Id. (internal citation omitted). The evidence does not support this argument. Hazen testified that it was a "classic thing" that inmates would "cheek," hoard and sell medication, but conceded that she didn't tell her supervisors about it in 2007. Inmates testified that "cheeking," hoarding and selling was happening, but appear not to have reported the practice to staff. This makes sense; inmates selling drugs likely wished to have the freedom to continue to do so, and inmates buying drugs likely wished to have that same freedom.

The plaintiff did not submit evidence that multiple HOC staff members employed there in 2007 were aware of the practices described and that they reported it to supervisors. Again, there is no evidence that there was a history of drug overdoses or deaths in the inmate population which should have put the policymaking authorities on alert. The plaintiff's argument is that because some—perhaps many—inmates were "cheeking" and selling drugs, the policymaking authorities had to have known. The evidence is insufficient to support that leap.

The plaintiff makes similar arguments with the evidence surrounding the days before, and the day of, Mr. Orlowski's death. All three former inmates either had seen Fitzpatrick "cheeking" or selling medication, or attested that they knew he was doing so. At least one of the former inmates knew that

Fitzpatrick was selling to Mr. Orlowski. At least one inmate testified that Mr. Orlowski had begun taking methadone after Fitzpatrick came on to the unit, and one was aware that Mr. Orlowski had been hoarding methadone and had taken it in the days leading up to his death, including the day before. One inmate attested to the fact that Mr. Orlowski's behavior indicated that he had been using drugs in the days immediately preceding his death.

Again, this argument rests on the assumption that one or more HOC employees failed to conduct mouth checks of Fitzpatrick, that that failure allowed him to "cheek" his methadone, which led to his ability to sell it to Mr. Orlowski, who then hoarded it and overdosed on it, and then exhibited symptoms of sleep apnea which misled correctional officers as to the nature of his medical condition. The argument asks the court to hold the County liable for the misconduct of that employee (or those employees), which requires the court to assume that because at least four inmates (including Mr. Orlowski) were aware that Fitzpatrick was "cheeking" and selling his meds, the policymaking authorities with the County had to have known. This assumption requires more of a leap; it requires the court to assume that the activities of a single inmate, who was on the unit for a relatively short period of time, were so widespread and well known that word of his activities must have filtered up to those who formulate policy at the HOC. Again, the evidence does not support this assumption. There is insufficient evidence in the record to establish that the policymakers in the County had reason to know of the failure to conduct mouth checks, and the inmate practice of "cheeking" and drug trading.

There is another problem with the plaintiff's argument, and it goes to the requirement that in order for the court to impose Monell liability, the plaintiff must submit evidence of a causal link between the custom or practice and the harm—in this case, Mr. Orlowski's death. The Seventh Circuit has held that

> [a] governmental body's policies must be the *moving* force behind the constitutional violation before we can impose liability under *Monell*. In § 1983 actions, the Supreme Court has been especially concerned with the broad application of causation principles in a way that would render municipalities vicariously liable for their officers' actions. That is why some courts distinguish between the acts that caused the injury and those that were merely contributing factors.

Thomas, 604 F.3d at 306 (internal citations omitted). In order to prevail on the Monell claim, the plaintiff must show that the failure to conduct mouth checks, or the failure to prevent inmate drug trafficking—even if policymakers had been aware of those failures—was the *moving force* behind the County's violation of an inmate's right.

The plaintiff argues that staff failure to conduct mouth checks and failure to halt inmate drug trafficking caused Mr. Orlowski's death, because he would not have had the opportunity to obtain and ingest a fatal overdose of methadone if the County had been ensuring that HOC inmates swallowed their methadone pills. Stated differently, the plaintiff contends that the manner in which HOC nurses and officers administered the HOC's medication distribution program caused a constitutionally deficient condition of confinement.

39

This claim sounds in the nature of an Eighth Amendment claim that the HOC failed to protect Mr. Orlowski and other inmates against possible self-inflicted harm caused by an overdose of drugs obtained from another inmate. The Seventh Circuit considered a somewhat similar claim in Grieveson v. Anderson, 538 F.3d 763 (7th Cir. 2008). In Grieveson, the plaintiff claimed that the Marion County, Indiana, Jail followed an unconstitutional practice of dispensing "an inmate's entire prescription at one time, in full view of other prisoners, placing in harm's way the prisoner with the prescription." Id. at 773. The district court granted summary judgment in favor of the county, and the Seventh Circuit affirmed. The panel in Grieveson explained:

> A practice of dispensing full bottles of prescription medicine to inmates may be an impermissible manner of operating under the Constitution—though Grieveson did not present expert evidence or caselaw addressing the effects of dispensing entire drug prescriptions at once. From the little we know, the alleged practice provides inmates with quantities of medicine that could potentially allow them to overdose and that could place them at risk for having their needed medication stolen. But we need not decide whether the practice is unconstitutional, because Grieveson has not put forth adequate evidence showing that the alleged practice was widespread and reflective of a policy choice by the Marion County Sheriff, which is the pivotal requirement of a § 1983 official capacity claim.

Id. at 774.

The court did not hold that the jail's practice of dispensing entire prescriptions at once was unconstitutional—it hazarded that it might be. The practice the plaintiff alleges here is proximally steps removed from the practice described in Grieveson. In Grieveson, the court speculated that inmates who

40

saw someone receive a full bottle of pills might harm him to get some, or that the inmate might take more than the prescribed amount and overdose. One might argue that the jail's action in handing out the full prescription in full view of other inmates was the "moving force" that exposed inmates to both of those risks. Here, the plaintiff argues that the County caused Mr. Orlowski's death in the following way:

(1) One or more members of the staff provided methadone to Fitzpatrick. (2) At least one, and possibly more than one, of those staff members failed to conduct a mouth check. (3) Because the staff member or members failed to conduct a mouth check, Fitzpatrick was able to "cheek" methadone. (4) Fitzpatrick was able to sell the methadone he "cheeked" to other inmates. (5) Fitzpatrick was able to "cheek" enough methadone to sell multiple tablets to Mr. Orlowski. (6) Mr. Orlowski was able to trade for enough methadone, and hoard enough of the methadone he traded for, to take enough pills to cause a fatal overdose. (7) Mr. Orlowski's physical reactions appeared to staff like symptoms of sleep apnea, rather than symptoms of an overdose, which meant that the staff did not react as they would to someone in the throes of an overdose.

This string of connections resembles the "litany" of interacting policy failures the plaintiff alleged in <u>Thomas</u>. In that case, the plaintiff (the mother of a deceased inmate) argued that the court should affirm the jury's verdict against the sheriff under <u>Monell</u> because the sheriff's alleged policy or practice of "severely understaffing correctional officers" caused the plaintiff's son to die

41

from pneumococcal meningitis. Thomas, 604 F.3d at 297, 302. The Seventh Circuit explained that §1983 explicitly requires "plaintiffs to show that their injuries were caused by the policies or practices complained of," which is "an uncontroversial application of basic tort law." Id. While the court found that the evidence supported the jury's verdict that the individual officers were liable because they failed to respond to the plaintiff's serious medical needs, it counseled that, "in cases such as this, where individual defendants are commingled with governmental bodies, and the plaintiff alleges a litany of policy failures that interact to create some constitutional harm, it is sometimes easier to obscure the causal links between different actors." Id. The Thomas court found no evidence to support the jury's verdict that a policy of understaffing caused the plaintiff's son's death, as opposed to the failures of the individual officers, and remanded the case to the district court with instructions to enter judgment in the sheriff's favor.

The theory that the plaintiff urges this court to adopt makes it even more difficult to tease out the causal links between actors. There are the nurses and HOC officers who fail to perform mouth checks. There are inmates—who do not act under color of law—who take advantage of that opportunity to "cheek" their medication. Some, if not all, of those inmates decide to sell their medications to other inmates. There are inmates who trade for those medications. There was at least one inmate who traded for enough of those medications to ingest a fatal overdose, and who did so. And that inmate exhibited physical responses to the overdose that appeared to the staff like the symptoms of sleep apnea.

42

The court can infer, for purposes of summary judgment, that the "litany of policy failures" the plaintiff alleges were factors that contributed to Mr. Orlowski's ability to obtain methadone, and to his ability to overdose. While the County's policy failures might have facilitated Mr. Orlowski's access to methadone, however, Mr. Orlowski's overdose followed multiple events that took place *after* Fitzpatrick received methadone from the HOC staff: Fitzpatrick cheeked his methadone pills, then sold them Mr. Orlowski, who ingested a sufficient amount of methadone to cause a fatal overdose, which produced symptoms that were consistent with sleep apnea and did not indicate the need for immediate medical attention until a time when Mr. Orlowski could not be resuscitated. In other words, the plaintiff argues that the County is liable for Mr. Orlowski's death, but his causation theory does not adequately account for the difference between a "but for" cause, which is not sufficient to impose liability under <u>Monell</u>, and a "moving force" or proximate cause of a constitutional violation.

In light of the Supreme Court's concern, reiterated in <u>Thomas</u>, that courts should not impose <u>Monell</u> liability based on "broad causation principles," the court cannot allow a <u>Monell</u> claim to proceed under a theory that the *County* violated Mr. Orlowski's constitutional right to "humane conditions of confinement," <u>Farmer</u>, 511 U.S. at 832, or failed to protect him from self-inflicted injury, based on allegations that unidentified HOC staff members did not adequately enforce the HOC's written medication distribution policy, which made it possible for Mr. Orlowski to acquire an ingest a fatal dose

43

of methadone from another inmate. The court finds that, at most, this alleged practice amounts to negligence, not deliberate indifference, and negligence is insufficient to establish liability under the deliberate indifference standard. Farmer, 511 U.S. at 835-36, n.4 (the deliberate indifference standard requires more than "mere negligence," gross negligence or recklessness). For that reason, the court cannot find that the County's alleged practice of failing to enforce mouth inspections was the "moving force" behind a constitutional violation that caused Mr. Orlowski's death.

> 3. The Plaintiff Did Not Timely Move for Summary Judgment, and the Court Declines The Plaintiff's Untimely Request to Do So.

The court's scheduling order required the parties to file their summary judgment motions on or before December 18, 2015; the plaintiff did not do so. Instead, after the defendants had timely filed their motion, the plaintiff declared in his opposition brief that he was seeking summary judgment under Rule 56(f)(1). Dkt. No. 51 at 4. The plaintiff construes Rule 56(f) to allow him to avoid complying with the court-ordered deadline, then later move for summary judgment, effectively granting himself a thirty-day extension in which to file his motion. That is not how Rule 56(f) works.

Rule 56(f) is captioned "Judgment Independent of the Motion," and it grants the court the authority to enter summary judgment *on its own motion*. Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund, 778 F.3d 593, 603 (7th Cir. 2015). Under Rule 56(f), the court may enter summary judgment in favor of a non-moving party, grant summary judgment on grounds that the parties

44

did not raise, or consider summary judgment on its own, even if no party has moved for summary judgment. Fed. R. Civ. P. 56(f). The court, however, must give the party against whom judgment might be entered notice of that possibility, and provide reasonable time for response. Hotel 71, 778 F.3d at 603; see also Lalowski v. City of Des Plaines, 789 F.3d 784, 794 (7th Cir. 2015) ("Because no party moved for it, the district court could grant summary judgment on Lalowski's administrative review claim only [a]fter giving notice and a reasonable time to respond.").

Rule 56(f) addresses the *court's* authority to consider *sua sponte* whether summary judgment is appropriate. It does *not* enable a party to do what the plaintiff in this case has done: ignore a dispositive motion deadline set in a scheduling order and then announce at some later time of its own choosing that it is moving for summary judgment. See Fed. R. Civ. P. 56(b) (Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.). The court construes the plaintiff's invocation of Rule 56(f) as a late request for an extension of time to file his own motion for summary judgment. The court declines that request.[7]

---

[7] The court also rejects the plaintiff's conclusory argument that that the defendants should be sanctioned (either by the denial of their motion as to the plaintiff's conditions of confinement claim or through entry of judgment in the plaintiff's favor) because the Zebra-2 log book for the week of November 15-21, 2007 and employee schedules from November 2007 were destroyed. Dkt. No. 51 at 27-30. Courts conduct a two-part inquiry to determine whether a sanction is warranted for spoliation of evidence: the court must find that the party had a duty to preserve evidence because it knew or should have known that litigation was imminent, and the court must find that the evidence was

45

## II.    PLAINTIFF'S MOTION TO STRIKE

Invoking Civil Local Rule 56(b), the defendants filed a reply to the plaintiff's responses to the defendants' proposed findings of fact. Dkt. No. 60. The plaintiff moved to strike that document as an improper pleading, because Civil Local Rule 56(b) allows a reply to *additional facts* submitted by the non-moving party, but not a reply to the non-moving party's *responses* to the moving party's statements of fact. Dkt. No. 64. The language of Civil Local Rule 56(b) does not appear to contemplate a reply to a non-moving party's responses to the moving party's findings of fact. Because the court's summary judgment determination is based on the materials that properly were submitted by the defendants, the court did not rely upon Dkt. No. 60. Accordingly, the court will deny the plaintiff's motion to strike as moot.

## II.    CONCLUSION

The court concludes that there is no dispute as to any genuine issue of material fact, and that the defendants are entitled to judgment as a matter of law. Accordingly, the court **GRANTS** the defendants' Motion for Summary Judgment, Dkt. No. 45, **DISMISSES** the plaintiff's complaint in its entirety, and

---

destroyed in bad faith. See Trask-Morton v. Motel 6 Operation L.P., 534 F.3d 672, 681 (7th Cir. 2008). Even if the defendants knew or should have known that litigation would ensue after Mr. Orlowski's death, the plaintiffs have made no showing that the defendants acted in bad faith in disposing of the log book or work schedules.

**DENIES AS MOOT** the plaintiff's motion to strike the defendants' improper

pleading. Dkt. No. 64. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 21st day of April, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge